**2019 UT App 209**

# THE UTAH COURT OF APPEALS

STEPHANIE D. CHARD AND TRAINING TABLE RESTAURANTS INC.,
Appellants and Cross-appellees,
*v.*
KENT J. CHARD, PETER M. ENNENGA, DON SORENSEN, TRAINING
TABLE LAND AND HOLDING LC, AND TT THREE LC,
Appellees and Cross-appellants
THOMAS E. LOWE, LOWE HUTCHINSON & COTTINGHAM PC,
Appellees.

Opinion
No. 20180585-CA
Filed December 19, 2019

Third District Court, Salt Lake Department
The Honorable Robert P. Faust
No. 160903525

Andrew G. Deiss and John Robinson Jr., Attorneys
for Appellants and Cross-appellees

Byron G. Martin and Steven M. Edmonds, Attorneys
for Appellees and Cross-appellants Thomas E. Lowe
and Lowe Hutchison & Cottingham PC

Thomas R. Barton, Alex B. Leeman, and
Mark O. VanWagoner, Attorneys for Appellees
and Cross-appellants Kent J. Chard, Peter M.
Ennenga, Don Sorensen, Training Table Land
and Holding LC, and TT Three LC

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES JILL M. POHLMAN and DIANA HAGEN concurred.

HARRIS, Judge:

¶1 Since December 2016, Utahns have no longer been able to order a hearty plate of chili cheese fries from a restaurant table telephone. This unfortunate circumstance resulted from the sudden closure of the Training Table restaurants, which had been open for business along the Wasatch Front since the late 1970s. The closure, in turn, was the result of a bitter intra-family dispute between a father and a daughter, both of whom owned a 50% interest in the restaurants. The dispute between them eventually reached the courts, when Stephanie D. Chard sued her father Kent J. Chard and various related individuals and entities. Kent[1] responded by filing a counterclaim, as well as causing two of his companies— which owned the land underneath the restaurants—to file a separate complaint seeking to evict the restaurants for non-payment of rent.

¶2 The landlord entities prevailed in the eviction proceedings, resulting in the closure of the restaurants. Later, the district court, on summary judgment, dismissed all of Stephanie's claims against Kent and the other defendants, as well as all the counterclaims filed by Kent and the landlord entities. Both sides now appeal, and seek reinstatement of some of their dismissed claims. For the reasons set forth below, we affirm the dismissal of many of the claims, but reverse the district court's dismissal of a few claims, at least one on each side, and remand for further proceedings.

---

1. "As is our practice in cases where [multiple] parties share a last name, we refer to the parties by their first name with no disrespect intended by the apparent informality." *Smith v. Smith*, 2017 UT App 40, ¶ 2 n.1, 392 P.3d 985.

BACKGROUND[2]

¶3    Kent, along with three other partners, founded the Training Table restaurant chain in 1977, and operated the restaurants through Training Table Restaurants Inc. (TTR). While TTR, at various times, had as many as ten restaurants, it did not own the real estate that any of the restaurants occupied. The underlying properties were owned by two limited liability companies—TT Three LC (TT3) and Training Table Land and Holding Company LC (TTL&H) (collectively, Landlords)—formed by Kent and in which Kent owned a significant interest.[3] Over the years, and certainly during all relevant times, Landlords realized most of their income from the rents that TTR paid them, and Kent drew the bulk of his personal income from distributions from Landlords.

¶4    Because the restaurants were the family business, Stephanie had grown up around them, even working part-time for the business when she was a teenager, and had grown quite familiar with the restaurants, their locations, and their operation. In November 2012, Stephanie was a recent college graduate

---

2. The facts set forth herein are largely undisputed. To the extent they are disputed, for the purposes of this appeal we view and describe the relevant facts in the light most favorable to the non-moving party. *See Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600 (stating that, on appeal from a district court's summary judgment ruling, we view "the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party" (quotation simplified)).

3. During the relevant time period, Kent owned 49.5% of TT3 and 75% of TTL&H. Peter M. Ennenga held a 1% interest in TT3, and the other 49.5% was owned by a profit sharing plan affiliated with Don Sorensen's accounting firm.

looking to formally enter the family business, and she used part of an inheritance to purchase a 50% interest in TTR from a third party for $100,000. The purchase price was derived from a professional appraisal of the business, which pegged the value of the entire business at $200,000. Upon completion of the purchase, Stephanie became a director of TTR and an equal partner with Kent in the restaurants (but acquired no interest in the properties or Landlords).

¶5      At that point in time, Kent was TTR's president, and TTR's board of directors consisted of Stephanie, Kent, Peter M. Ennenga, and Don Sorensen. Both Ennenga and Sorensen were longtime friends of and advisers to the Chard family, with Ennenga acting as a legal and business advisor, and Sorensen serving as the family accountant. Ennenga had been a licensed attorney until he was disbarred in 2001; after that, he continued to advise the Chard family, often through his new position as a paralegal for the law firm Lowe Hutchinson & Cottingham PC (LHC). For many years, LHC had served as TTR's legal counsel, performing extensive work on Kent's and TTR's behalf. The parties agree that LHC and Ennenga represented Kent during the 2012 purchase transaction, but the parties disagree as to whether Ennenga also represented Stephanie for the purposes of that transaction.

¶6      On November 16, 2012, shortly after Stephanie acquired her interest in the restaurants, TTR's board of directors held a meeting to discuss certain changes to the restaurant leases that Landlords had proposed, including an increase in the monthly rents that TTR would owe to Landlords. Across TTR's five then-operating locations, the proposal would increase TTR's monthly rent from $29,000 per month to $30,500 per month. All four members of TTR's board participated in the meeting, including Stephanie and Kent. The decision to raise the rent was based on a recent appraisal of Landlords' properties, and motivated by Landlords' desire to keep the rent consistent with nearby

locations. Stephanie, as a member of the board, had access to this appraisal, and would have been aware of the underlying reasons for the proposed rent increase. During the meeting, TTR's board unanimously approved the proposed changes, which were memorialized in a series of written addenda (the Addenda) to the leases, and were made effective as of November 1, 2012.

¶7     Thereafter, TTR paid the increased monthly rent to Landlords, without complaint, for about three years. During this time, Kent continued to serve as TTR's president, and both Kent and Stephanie continued to serve as members of its board of directors. In 2014, however, at Stephanie's request, she was elevated to TTR's chief operating officer, and assumed a greater role in the company's day-to-day operations. A few months later, in January 2015, Kent stepped down as TTR's president, and Stephanie took his place, thereby assuming complete control of TTR's operations.

¶8     Soon after taking operational control of TTR, Stephanie began consulting with a different law firm (New Firm) regarding her family's overall estate plan. Initially, New Firm represented the Chard family collectively, and also provided corporate advice to TTR through Stephanie. In December 2015, New Firm sent a letter to Kent recommending a business succession plan (the Succession Plan). Under the terms of the proposed Succession Plan, Stephanie would purchase the remaining interests in TTR and Landlords on an installment basis, thus allowing Kent an income and eventually giving Stephanie complete ownership and control of not only TTR, but of Landlords as well. New Firm proposed enacting the Succession Plan effective January 1, 2016.

¶9     After conferring with Ennenga and Sorensen, Kent determined that the Succession Plan was not in his best interest, and therefore rejected it. In response, Stephanie began exploring with New Firm how to put "pressure" on Kent to accept her

proposal, telling New Firm to "get aggressive" and "unleash the beast." Stephanie and her lawyers eventually sent a letter to LHC, with a copy to Kent, stating that New Firm (rather than LHC) was now counsel to TTR, and requesting that Ennenga and Sorensen step down from TTR's board of directors. In the letter, New Firm contended that Ennenga and Sorensen had conflicts of interest due to their ownership interests in TT3 and that Ennenga had been engaging in the unauthorized practice of law.

¶10    Stephanie knew that her strategy might not be well received, because Ennenga and Sorensen had been Kent's friends and advisors for several decades. And, as it happened, Kent did not respond well to Stephanie's demand: shortly after learning of it, Kent attempted suicide and was hospitalized for about two weeks. While Kent was recovering, Stephanie visited Kent in the hospital and brought documents for Kent to sign to effectuate the removal of Ennenga and Sorensen from the board of TTR. Kent refused to sign the documents.

¶11    In addition to sending a demand letter, Stephanie also directed TTR to begin withholding rent payments to Landlords, asserting generally that the rent amounts that had been approved in November 2012 were unfairly high. Specifically, she claimed that she had purchased her interest in TTR without meaningful legal representation, and that the Addenda had not been drafted and reviewed by an attorney prior to execution. Stephanie again floated the Succession Plan as a potential solution to these problems, and indicated that TTR would continue to withhold rent payments until the issues identified in the Succession Plan were resolved.

¶12    Kent was not opposed, in principle, to selling the business entities to Stephanie, but was of the view that the price Stephanie was offering was too low. After negotiations with Stephanie broke down, Landlords (at Kent's direction) began shopping the properties to third parties. A few weeks later, after

locating a third-party buyer, Kent informed Stephanie that Landlords had decided to accept a competing offer to purchase Landlords' properties for a higher price than Stephanie had offered. Stephanie's response was to file a lawsuit.

¶13 Stephanie's lawsuit, as eventually amended, included claims against not only Kent, but also against Landlords, Ennenga, Sorensen, and LHC, and included claims personal to Stephanie, as well as derivative claims she purported to assert on behalf of TTR. The causes of action included breach of fiduciary duty, quiet title, failure to hold court-ordered shareholders meetings, unjust enrichment, judicial removal of directors, legal malpractice, securities fraud, common law fraud, and negligent misrepresentation. Though the claims varied in type, the underlying grievance motivating most of the claims was the asserted unfairness of the rental rates agreed upon in November 2012. In addition, soon after filing her lawsuit, Stephanie recorded a series of lis pendens against Landlords' properties.

¶14 Kent, Landlords, Ennenga, Sorensen, and LHC responded to Stephanie's lawsuit by moving to dismiss her claims; in addition, Kent and Landlords filed counterclaims of their own for, among other things, wrongful lien, breach of fiduciary duty, and infliction of emotional distress. Landlords also asked the court to release the lis pendens, which were holding up the sale of the properties to the third-party buyer. Following a hearing in September 2016, the district court dismissed Stephanie's derivative claims, and ordered the lis pendens to be released. In addition, the court dismissed the malpractice claim against Ennenga, reasoning that a legal malpractice claim could not lie against a person who was not a licensed attorney.

¶15 Meanwhile, TTR (at Stephanie's direction) continued to withhold rent from Landlords with regard to three of the five then-operating restaurants. In October 2016, after the district court's ruling on the initial motions, Landlords filed a separate

lawsuit seeking to evict TTR from the three locations where TTR was still behind on its rent obligations. In response, TTR filed an answer alleging various defenses, including its claim that the amount of monthly rent was unfair.

¶16 Eventually, the district court consolidated Landlords' eviction complaint into the main action brought by Stephanie. However, the court kept the eviction action separate for purposes of discovery and trial, limiting the scope of the eviction action to resolution of the issue of possession of the properties as well as damages related to Kent's unlawful detainer claim against TTR. But because one of TTR's main defenses to the eviction action was the unfairness of the rent amounts, the district court believed that the fairness of the rents was at issue in the eviction action as well as in the main case, noting that litigation of that issue in connection with the eviction part of the case could very well have preclusive effect on the remainder of the case. Indeed, the court stated that a "determination on the rent values and the validity of these leases" in Landlords' favor in the eviction proceedings would "eliminate" some of Stephanie's claims in the main case, and that she would not "be able to raise and bring up again" those claims in the main case.

¶17 The eviction portion of the litigation was ready for trial first, and the court scheduled a three-day trial on those issues to take place in January 2017. On the first day of trial, however, TTR announced that it was prepared to stipulate to judgment in the eviction portion of the case. In the process of discussing the stipulated judgment, the district court expressed its view that, by stipulating to a judgment in the eviction case, TTR was in effect conceding "that the leases were not inappropriate," and that it would not later be allowed to argue to the contrary in the main case. In response, TTR's counsel (who also represented Stephanie in the main case) stated that he was "in agreement with that," because "all of the defenses that are asserted . . . have been adjudicated and decided if judgment . . . is entered" in the

eviction case. Indeed, the district court later stated, in a written order, that "[a]t the eviction hearing, the Court clearly barred any claim connected to the issue of rent." Following the eviction hearing, the district court entered judgment against TTR and in favor of Landlords for past due rents, in the amount of $256,824.53 plus attorney fees. TTR appealed that judgment, and this court entered an order affirming it.

¶18　While the eviction piece of the lawsuit was being litigated, the parties conducted discovery in the main action. While all parties submitted initial disclosures, as required by rule 26(a) of the Utah Rules of Civil Procedure, neither Stephanie nor Kent[4] included a computation of damages in connection with their disclosures. *See* Utah R. Civ. P. 26(a)(1)(C). Stephanie's damages disclosure stated simply that "Plaintiffs have not yet calculated their damages" and that they "reserve the right to amend or supplement their computation of damages after the completion of all discovery in this case." Kent's initial disclosure was no better, merely stating that "Defendants have not yet calculated their damages," and that they "reserve the right to supplement this response." Neither Stephanie nor Kent included in their initial disclosures specific categories of damages or any computation methodologies.

¶19　Stephanie later sent Kent some interrogatories regarding damages, and Kent responded in March 2017, some five months before the fact discovery cutoff date. Kent's responses

---

4. Sometimes, when referring to action taken in the litigation or on appeal, we use the term "Stephanie" to refer to actions taken collectively by Stephanie and TTR, and we use the term "Kent" to refer to actions taken collectively by Kent, Landlords, Ennenga, and Sorensen. When use of the individual references is necessary to convey more precise meaning, we use the individual references.

included detailed information about his claimed damages, including categories of damages, computation methodologies, and calculations of amounts claimed. Kent did not send Stephanie any damages interrogatories, and therefore Stephanie did not respond to any, nor did she supplement her initial disclosures prior to the conclusion of the fact discovery period.

¶20 In August 2017, on or around the day fact discovery ended, both parties filed supplemental disclosures. Kent's supplement included some updated dollar figures for some categories of damages, but in the main provided essentially the same information already set forth in his March 2017 discovery responses. Stephanie's supplement, by contrast, provided a lot of information that had never before been disclosed, including categories of damages and computation methodologies.

¶21 While Stephanie's initial disclosures were quite spare with regard to damages, those disclosures identified a number of witnesses who had "information supporting [her] claims and defenses," and whom she "expect[ed] to call in [her] case in chief" at trial. Two of the witnesses she listed were attorneys at New Firm that she had consulted for advice not only regarding TTR but also regarding issues unique to her. She disclosed that one of the attorneys had "knowledge concerning matters in the pleadings, including but not limited to TTR and the damages caused to TTR by defendants' actions." She disclosed that the other attorney had "knowledge concerning matters in the pleadings, including but not limited to Ennenga's breaches of duty to TTR and Stephanie."

¶22 In response to these broad disclosures that Stephanie's own attorneys had relevant information about "matters in the pleadings" and that Stephanie intended to call them as trial witnesses, Kent issued subpoenas to the attorneys and asked to

take their depositions. The two attorneys—but not Stephanie— filed objections, arguing that the subpoenas would require them to disclose information that was protected by attorney-client privilege. Kent then filed a Statement of Discovery Issues asking the court to overrule the attorneys' objections, and therein made two basic arguments: first, that because Kent was a director of TTR, he was entitled to access all communications between TTR and its lawyers; and second, that even if the legal advice the attorneys had given was for Stephanie alone, Stephanie had waived any privilege when she broadly disclosed her attorneys as witnesses she intended to call at trial regarding "matters in the pleadings." The court agreed with both of Kent's arguments, and ruled, as relevant to the second argument, that Stephanie had placed her attorneys' "knowledge and the communications they had with [her] at issue" when she disclosed them as witnesses on all issues in the case, and that she had thereby waived any privilege. Following the court's ruling, the attorneys each complied with the subpoena, produced documents, and sat for a deposition.

¶23 About a year later, after discovery was complete, Stephanie filed a motion asking the court to prevent Kent from using her attorneys' documents at trial, asserting that— even though the court had already ruled that the privilege had been waived—those documents were nevertheless protected by the attorney-client privilege. The court issued a written ruling on the motion, apparently granting the motion as to Stephanie's personal privilege, but denying the motion as to documents related to TTR's privilege. However, the court concluded its ruling by stating that the privilege regarding "[t]he information from [New Firm's] attorneys has been waived . . . when [Stephanie] named the attorneys to be witnesses in this case."

¶24 While discovery was ongoing in the main action, Landlords—judgment creditors of TTR as a result of the

judgment entered in the eviction action—took steps to execute on some of TTR's assets, including any claims or causes of action that TTR might assert in the main action. Landlords put those claims up for auction at a sheriff's sale, and ended up purchasing those claims themselves.

¶25 Following the close of discovery, Kent and LHC filed summary judgment motions, asking the court, for various reasons, to dismiss all of Stephanie's claims. Stephanie opposed those motions, and filed a summary judgment motion of her own, seeking dismissal of Kent's counterclaims. The district court held two hearings on the motions, and issued two separate written decisions, eventually granting both sides' motions and dismissing all of Stephanie's and Kent's claims. As the district court saw it, Stephanie's claims failed for a number of reasons, including grounds common to most or all of her claims (such as failure to submit timely or sufficient damages disclosures, and the preclusive effect of the eviction judgment on claims related to fairness of the rents), as well as grounds unique to various causes of action (such as the claims being untimely filed or purchased by Landlords in the sheriff's sale). The district court applied similar principles to its analysis of Kent's counterclaims, determining that Kent's damages disclosures had likewise been untimely and insufficient, and ruling that each of Kent's claims had individual infirmities as well.

¶26 With regard to Kent's and Stephanie's respective personal claims against the other for breach of fiduciary duty, the district court determined that Kent and Stephanie had agreed, in open court, to mutually dismiss those claims against each other. In a written ruling, the district court dismissed Stephanie's claims for breach of fiduciary duty, ruling that "Stephanie's claims are derivative because the alleged harm is the result of financial injury to TTR," and concluding that any derivative claims were subject to dismissal for several reasons, including

the fact that any claims belonging to TTR had been sold to Landlords at the sheriff's sale. Following that ruling, Stephanie protested that her claims for breach of fiduciary duty included both derivative claims and personal claims, and attempted to persuade the district court to reinstate her claims insofar as they constituted personal claims.

¶27　At a later hearing, Kent's attorney acknowledged that Stephanie's assertion that she pleaded personal (in addition to derivative) claims for breach of fiduciary duty "got lost in the shuffle" of the earlier-decided motions, and that the court had not yet definitively ruled on the issue. Kent's lawyer pointed out that Kent had pleaded a mirror-image personal claim for breach of fiduciary duty against Stephanie, and noted that the two claims must rise and fall together: "either we can go forward with it and they go forward with it, or neither one of us can." Kent's attorney then made an offer, in open court, to give up Kent's claim if Stephanie would do the same with hers. Stephanie and her attorney agreed to that deal, and the court twice clarified that the parties were both agreeing to dismiss their fiduciary duty claims, noting that the deal "would leave [Stephanie] with nothing on a breach of fiduciary duty claim" because the court had already dismissed her derivative claims. Both Stephanie's attorney and Kent's attorney twice affirmed that the court was correctly stating the terms of the stipulation. The court then entered an order dismissing Kent's and Stephanie's mutual personal claims for breach of fiduciary duty, based on the agreement they reached in open court.

¶28　Following these various rulings, the district court entered a final judgment in the case, proclaiming that it "has now adjudicated all the claims, rights[,] and liabilities of all the parties in this action," and specifically noted that it had dismissed all the causes of action brought by Stephanie in her complaint and by Kent in his counterclaim.

ISSUES AND STANDARDS OF REVIEW

¶29    Both parties take issue with the district court's summary judgment orders, and appeal the dismissal of at least some of their claims. Stephanie appeals the dismissal of four groups of claims: for legal malpractice, fraud, breach of fiduciary duty, and unjust enrichment.[5] Kent cross-appeals the dismissal of his counterclaims for wrongful lien, breach of fiduciary duty, and intentional and negligent infliction of emotional distress.

¶30    The district court gave several reasons for dismissing the parties' claims. To the extent these claims were dismissed on the merits, as a matter of law on summary judgment, we review the district court's decision for correctness, affording it no deference. *See Penunuri v. Sundance Partners, Ltd.*, 2017 UT 54, ¶ 14, 423 P.3d 1150. To the extent these claims were dismissed as a discovery sanction, we review the district court's decision for abuse of discretion. *See Keystone Ins. Agency, LLC v. Inside Ins., LLC*, 2019 UT 20, ¶ 12, 445 P.3d 434.

¶31    In addition, Kent cross-appeals the district court's attorney-client privilege ruling, made pursuant to Stephanie's motion in limine, that he would not be allowed to use, at trial, documents and communications concerning the two designated attorneys' representation of Stephanie in her individual capacity. "The existence of a privilege is a question of law for the court, which we review for correctness, giving no deference to the [district] court's determination." *Staley v. Jolles*, 2010 UT 19, ¶ 9, 230 P.3d 1007 (quotation simplified).

---

5. Although the court dismissed all of Stephanie's claims, she has not appealed the dismissal of several of her claims, including her claims for quiet title, securities fraud, failure to hold a court-ordered shareholders meeting, and judicial removal of directors.

ANALYSIS

I. Stephanie's Appeal

A.    Legal Malpractice and Fraud

¶32    The district court dismissed Stephanie's claims for legal malpractice and fraud, giving multiple independent reasons for its ruling, including its belief that legal malpractice claims could not be brought against non-lawyers, and its belief that Stephanie's fraud claims as well as her claims against LHC were time-barred. One of the chief bases for its ruling, however, was that the eviction proceedings, including the stipulation to judgment, had resolved all issues related to the reasonableness of the increased monthly rents that TTR had paid to Landlords after November 2012, and that Stephanie was therefore precluded from re-litigating any claims related to the reasonableness of the rent, including her claims for legal malpractice and fraud, which the court interpreted as based upon a contention that the rents were unfair. Indeed, the court expressly rejected Stephanie's assertion that her malpractice and fraud claims were broader than that, stating as follows:

> While [Stephanie and TTR] also contend that the fraud and legal malpractice claims are distinct, everything revolves around the fairness of the rent. The crux of the failures is that if a disclosure was made to Stephanie, she now claims that she would not have purchased TTR shares and would not have suffered damage from the increased rent and allegedly self-interested lease provisions. These are rent related issues [that] have been resolved.

¶33    In her brief on appeal, Stephanie does take issue with the district court's dismissal of her claims for legal malpractice

and fraud, but—at least in her opening brief—she addresses only *some* of the court's independent reasons for the dismissal of these claims. For instance, she asserts that the court erred by concluding that legal malpractice claims cannot be brought against non-lawyers, and by concluding that her fraud claims, as well as her malpractice claims against LHC, were time-barred. But she does not—at least until her reply brief—take issue with the court's conclusion that her legal malpractice and fraud claims were precluded by the resolution of the eviction case.

¶34 Appellants are not permitted to raise matters for the first time in a reply brief. *See State v. Evans*, 2019 UT App 145, ¶ 28 n.9, 449 P.3d 958, *petition for cert. filed*, Sept. 4, 2019 (No. 20190739). Indeed, "[w]hen a party fails to raise and argue an issue on appeal, or raises it for the first time in a reply brief, that issue is waived and will typically not be addressed by the appellate court." *State v. Johnson*, 2017 UT 76, ¶ 16, 416 P.3d 443; *see also Kendall v. Olsen*, 2017 UT 38, ¶ 13, 424 P.3d 12 (stating that it was "too late" for an appellant to address an issue "in his reply brief," because it "deprives the appellee of the chance to respond"). Thus, Stephanie waived her opportunity to appeal the district court's specific ruling that her legal malpractice and fraud claims were precluded by the resolution of the eviction part of the case.

¶35 And it is well-settled that "we will not reverse a ruling of the district court that rests on independent alternative grounds where the appellant challenges [fewer than all] of those grounds." *Kendall*, 2017 UT 38, ¶ 12 (quotation simplified). Here, Stephanie has failed to timely challenge one of the independent alternative bases for the district court's decision. We therefore have no choice but to affirm the district court's dismissal of Stephanie's legal malpractice and fraud claims, on the basis that Stephanie has failed to carry her burden of persuasion on appeal,

and "we do so without endorsing the merits of the district court's [preclusion] analysis." *See id.* ¶ 15.[6]

B.      Breach of Fiduciary Duty

¶36     Stephanie brought two different types of claims asserting breach of fiduciary duty: (a) derivative claims, for and on behalf of TTR, asserting that Kent and others had violated fiduciary duties owed to TTR, and (b) personal claims, on her own behalf, which she claimed she was able to bring under a "close corporation" exception, or on the basis that she had sustained harm independent of any harm TTR might have sustained. The district court dismissed Stephanie's derivative claims on the basis that those claims belonged to TTR and had been transferred to Landlords in the sheriff's sale; Stephanie does not appeal the dismissal of her derivative claims for breach of fiduciary duty. However, Stephanie does take issue with the court's dismissal of the remainder of her breach of fiduciary duty claims, the ones she characterizes as non-derivative.

¶37     But Stephanie's arguments overlook the fact that she and Kent reached a stipulation, in open court, to mutually dismiss their non-derivative claims for breach of fiduciary duty, and that the district court accepted the stipulation and dismissed her non-derivative claims on that basis.[7] She offers no reason why she should be relieved of the effects of that stipulation.

---

6. Because we affirm the dismissal of all of Stephanie's legal malpractice claims, we need not address the propriety of the district court's ruling—also appealed by Stephanie—regarding the admissibility of evidence of Ennenga's disbarment.

7. Kent also argues that Stephanie's non-derivative claims for breach of fiduciary duty are—like her claims for fraud and legal

(continued…)

¶38 When parties stipulate to a resolution of specific issues, that stipulation will generally bind the parties and the court. *Prinsburg State Bank v. Abundo*, 2012 UT 94, ¶ 13, 296 P.3d 709. Indeed, when parties forgo trial and "stipulate that a decree may be entered in conformity thereto, such contract if lawful has all the binding effect of findings of fact and conclusions of law made by the court." *Id.* (quotation simplified); *see also id.* ¶ 16 (stating that, by stipulating to a particular resolution of certain issues, "the parties stipulated away their right to challenge the district court's resolution of the issues in this case"). In light of the judicial efficiency that stipulations provide, "there is an institutional hesitancy to relieve a party from a stipulation negotiated and entered into with the advice of counsel." *Rivera v. State Farm Mutual Auto. Ins. Co.*, 2000 UT 36, ¶ 11, 1 P.3d 539 (quotation simplified). However, a court has the discretion to set aside a stipulation if certain conditions are met: (1) the party seeking relief from the stipulation must request it by motion from the district court; (2) any such motion must be timely filed; (3) the motion must show that the stipulation was entered into "inadvertently or for justifiable cause"; and (4) the district court must state its basis for relieving the parties of the stipulation. *Yeargin, Inc. v. Auditing Div. of Utah State Tax Comm'n*, 2001 UT 11, ¶ 21, 20 P.3d 287 (quotation simplified).

¶39 Stephanie made no motion before the district court to be relieved from her stipulation, and makes no effort in her briefs to explain why we should allow her to revive claims that she

_____

(…continued)

malpractice—all about the allegedly unfair monthly rent, and are therefore also resolved by Stephanie's decision not to appeal the district court's preclusion ruling. But because the district court did not appear to dismiss those claims on that basis, and because we affirm the district court's decision on other grounds, we do not reach Kent's argument in this regard.

agreed to jettison.[8] Accordingly, we consider Stephanie to have stipulated away her right to challenge the district court's dismissal of her non-derivative claims for breach of fiduciary duty, and we therefore affirm the district court's dismissal of those claims on this basis.

### C.     Unjust Enrichment

¶40    The only other claim whose dismissal Stephanie appeals here is her claim for unjust enrichment, in which she asserts that she performed $120,000 worth of work for Landlords but was never paid for that work. The district court dismissed the unjust enrichment claim in connection with its determination that Stephanie's damages disclosures were deficient.[9] Stephanie

---

8. At oral argument on appeal, Stephanie posited that the stipulation should not be binding upon her because she did not actually give up anything in the bargain, given that the district court had already dismissed all of her breach of fiduciary duty claims. We are not necessarily persuaded that stipulations are any less binding in the event that one party gives nothing up, but in any event Stephanie's argument is factually incorrect in this case. At the time the parties entered into the stipulation, Stephanie was attempting to revive at least some of her breach of fiduciary duty claims (the ones she considered non-derivative), and, as part of the bargain, agreed to give up any right to attempt to revive such claims.

9. It appears that the damages-disclosure issue was the *sole* basis upon which the district court dismissed this claim. Stephanie did not stipulate to its dismissal, and the district court made no determination that it was time-barred. Moreover, the gist of this claim has nothing to do with the monthly lease rate, and therefore this claim was not precluded by the resolution of the eviction proceedings.

asserts that the district court's dismissal of this claim as a sanction for insufficient damages disclosures was improper, asserting both (a) that her damages disclosures were sufficient, and (b) that even if they were not, the district court's dismissal of her unjust enrichment claim was unwarranted.

¶41 Applicable rules require litigants to include a damages computation in their initial disclosures. *See* Utah R. Civ. P. 26(a)(1)(C) (stating that initial disclosures are to include "a computation of any damages claimed and a copy of all discoverable documents or evidentiary material on which such computation is based, including materials about the nature and extent of injuries suffered"). Sometimes, litigants might not know, at the outset of the case, the precise amount of damages they intend to seek at trial, and may need to fine-tune their damages claims through discovery or the assistance of an expert. *See id.* R. 26 advisory committee's note (stating that "[n]ot all information will be known at the outset of a case," and that "damages often require additional discovery, and typically are the subject of expert testimony"). But litigants must "make a good faith attempt to compute damages to the extent it is possible to do so and must in any event provide all discoverable information on the subject, including materials related to the nature and extent of the damages." *Id.* Such information is important because, "[a]mong other things, it is a critical factor in determining proportionality." *Id.* At a minimum, a litigant's initial disclosures must include "the fact of damages," as well as the litigant's "method and computation for damages." *See Keystone Ins. Agency, LLC v. Inside Ins., LLC*, 2019 UT 20, ¶ 17, 445 P.3d 434 (quotation simplified).

¶42 In her initial disclosures, Stephanie did not set forth any categories of potential damage, or offer any methodology or formula for computing damages. Instead, her damages disclosure, in its entirety, stated as follows:

> Plaintiffs have not yet calculated their damages. Plaintiffs reserve the right to amend or supplement their computation of damages after the completion of all discovery in this case.

This is unquestionably insufficient. A person reading that damages disclosure would not know whether Stephanie viewed the case as one worth thousands or many millions of dollars, and also would not know what types of damages Stephanie intended to seek, or how she intended to go about computing them. The district court committed no error in labeling Stephanie's damages disclosure insufficient.

¶43 Rule 26(d)(4) of the Utah Rules of Civil Procedure prescribes the remedy in cases where a litigant's disclosure is insufficient: "If a party fails to disclose or to supplement timely a disclosure . . . , that party may not use the undisclosed witness, document or material at any hearing or trial unless the failure is harmless or the party shows good cause for the failure." The district court, applying this provision, excluded all of Stephanie's damages evidence as untimely disclosed, and therefore concluded that all of her causes of action—including her claim for unjust enrichment—should be dismissed for (among other reasons) lack of damages evidence.

¶44 Stephanie assails this ruling, at least as it pertains to her unjust enrichment claim, by asserting that her failure to serve adequate damages disclosures was harmless here, because (a) she explained, in her complaint, what the basis for her unjust enrichment claim was, and (b) she disclosed to Kent, during discovery, the simple invoices on which her unjust enrichment damages were based. She asserts that no "calculations" were involved in assessing her damages with regard to this claim, because she has only ever sought recovery of the amount on the face of the invoices that she sent to Kent originally, and disclosed to him again during discovery in the lawsuit. She points out that

Kent was fully able to conduct discovery, at least on the theory of damages she was advancing in connection with her unjust enrichment claim. In short, she argues that, "even assuming that it was appropriate to exclude [her] more complicated damage theories" as a sanction for her improper disclosure, it was nevertheless an abuse of discretion to "exclude the simple ones."

¶45   We agree. The key question in determining the existence of harmlessness under this rule is whether a plaintiff's failure to disclose its categories and methods of computing damages impaired the defense's ability to "properly build a defense against the damages claimed." *Keystone*, 2019 UT 20, ¶ 20. Our supreme court has identified several factors relevant to the question of harmlessness, including whether the defense was able to adequately (1) question witnesses, (2) determine the case's tier status under the applicable rules of civil procedure, (3) understand the nature and quantity of the plaintiff's claimed damages, and (4) understand the scope and cost of the litigation pursued. *See id.* ¶¶ 19–20. While Kent and Landlords may have been prejudiced by Stephanie's inadequate damages disclosures with regard to some of Stephanie's other, more complex causes of action, we cannot see how Kent or Landlords were harmed by Stephanie's inadequate damages disclosures related to her unjust enrichment claim. Kent and Landlords knew, from the outset, that at least part of this claim was about work Stephanie claimed to have performed for Landlords without remuneration, and they had in their possession the invoices that Stephanie was using to support and quantify her claim.

¶46   Because we affirm the dismissal of all of Stephanie's other claims on separate grounds, we need not consider here whether the district court's order excluding Stephanie's damages evidence with regard to those other claims was proper. Perhaps it was, given the complex nature of some of Stephanie's undisclosed damages theories regarding some of those other claims. But Stephanie's claim for unjust enrichment based on

services she provided to Landlords was straightforward and clear: she sought recovery for unpaid work she claimed to have performed on their behalf, which work was the subject of invoices she had sent to Landlords and produced in discovery. With regard to this single claim, we conclude that Stephanie's inadequate damages disclosures visited no harm upon Kent or Landlords, and we therefore reverse the district court's order excluding Stephanie's damages evidence with regard to her unjust enrichment claim based on services she provided to Landlords, as well as the court's related order dismissing that claim for lack of damages evidence, and remand for further proceedings on that claim.

## II. Kent's Cross-Appeal

### A.    Kent's Damages Disclosures

¶47    Kent's initial damages disclosures were no better than Stephanie's. In those disclosures, Kent stated simply that "Defendants have not yet calculated their damages," and that they "reserve the right to supplement this response." The district court correctly recognized the inadequacy of those disclosures, and issued an order excluding Kent's damages evidence, an order that resulted in the dismissal of some of Kent's counterclaims. Kent appeals the order excluding his damages evidence, and therefore dismissing some of his counterclaims, asserting that he atoned for his disclosure error by producing to Stephanie, during the discovery phase of the case and five months before discovery ended, damages calculations that were *not* deficient, as well as all necessary supporting documentation. In short, Kent contends that, even if his initial disclosures were inadequate, his discovery responses rendered that initial inadequacy harmless.

¶48    We agree. While his initial damages disclosures were inadequate, Kent's discovery responses were provided in March

2017, some five months prior to the end of fact discovery, and more than four months before Kent's second and third depositions. Those responses included detailed information about Kent's theories of damages, computation methodologies, and even Kent's best estimates of the amounts of damages he would be claiming at trial. Because Kent provided Stephanie with damages information in his discovery responses, and because those responses were provided relatively early during the discovery period, Kent's failure to provide adequate initial disclosures with regard to damages was rendered effectively harmless. Based on Kent's response to Stephanie's interrogatories, Stephanie had all of the information she needed to properly conduct discovery on Kent's claims; indeed, she did conduct such discovery, specifically marking Kent's discovery responses as a deposition exhibit and asking Kent about them.[10]

¶49    Accordingly, we reverse the district court's exclusion of Kent's damages evidence, as well as the district court's related order dismissing some of Kent's counterclaims for lack of proof.[11] None of Kent's counterclaims should have been dismissed on this basis.

---

10. Stephanie laments the fact that, in a roundabout way, she is being punished for propounding the damages interrogatories which prompted Kent to finally disclose the categories and computation methodologies of his damages. In the end, however, it does not matter what prompts a party to supplement inadequate disclosures; what matters is that a satisfactory supplementation occurred. Kent's discovery responses, in this case, constitute a sufficient supplementation.

11. One of the claims dismissed by the district court for lack of damages evidence, and reinstated here, is Kent's claim for negligent infliction of emotional distress (NIED); we reinstate

(continued…)

B.      Wrongful Lien

¶50    The district court alternatively dismissed Kent's wrongful lien counterclaim on its merits, in addition to dismissing it for lack of damages evidence. Kent takes issue with the district court's order dismissing this claim on its merits, and we find Kent's arguments persuasive.

¶51    After filing suit against Kent and Landlords in June 2016, Stephanie also recorded several lis pendens against Landlords' properties. In the lis pendens, Stephanie gave notice that she had filed a lawsuit against Landlords seeking "to reform the lease agreement associated with the following real property," and then gave a legal description. As noted above, the purported reformation she desired to make to the leases had to do with the amount of the monthly rental payment; it did not have to do with any dispute about the portion of the property TTR had the right to occupy.

¶52    Under Utah's lis pendens statute, "any party to an action filed in . . . a Utah district court that affects the title to, or the right of possession of, real property may file a notice of pendency of action." Utah Code Ann. § 78B-6-1303(1)(a) (LexisNexis 2018). Interpreting this language, we have emphasized that "a lis pendens may only be filed in connection with an action (1) affecting the title to real property, or (2) affecting the right of possession of real property." *Winters v. Schulman*, 1999 UT App 119, ¶ 21, 977 P.2d 1218 (quotation simplified). "Utah law does not allow for the filing of a lis

_____

(…continued)
that claim simply because we discern error in the district court's order of dismissal, and Stephanie does not ask us to—and we do not—affirm on alternative grounds. In any event, we make no comment on the merits of Kent's NIED claim.

pendens in cases seeking a money judgment." *Id.* ¶ 22 (quotation simplified); *see also Hamilton v. Smith*, 808 F.2d 36, 37 (10th Cir. 1986) (per curiam) ("[U]nder Utah law a notice of lis pendens may not be filed in anticipation of a money judgment."); *Bank of the West v. Whitney*, 301 F. Supp. 3d 1077, 1080 (D. Utah 2018) (concluding that a lis pendens filed against a judgment debtor's property was unlawful, because the judgment creditor was not asserting any interest in the debtor's real property other than suggesting its use to satisfy the judgment). Accordingly, it is unlawful to file a lis pendens that does not affect title to or the right to possess the property in question.

¶53 In this case, the lawsuit of which Stephanie was giving notice by recording her lis pendens did not include claims affecting title to or the right to possess Landlords' real property. The only manner in which Stephanie wanted to "reform the lease" was by changing the amount of monthly rent due thereunder. Even if Stephanie had been entirely successful in her lawsuit, and won a judgment reforming the leases to require a lower monthly rental payment, neither title nor her right to possess the property would have changed. TTR would still have occupied exactly the same square footage as it had before, and Landlords would still have owned the real property itself. The only thing that would have changed was the amount of monthly rent that TTR was paying to Landlords.

¶54 While we can possibly envision situations in which a tenant might be able to lawfully record a lis pendens on his landlord's property, our lis pendens statute does not permit a tenant whose only dispute with its landlord concerns the amount of the monthly rent payment to file a lis pendens against the landlord's property. Such a dispute affects neither title to nor the right to possess the property.

¶55 Accordingly, the district court erred in determining that Stephanie's claimed interest in Landlords' property was "a

type[] of interest for which *Lis Pendens* can be filed." We therefore reverse the court's dismissal of Kent's wrongful lien claim, and remand that claim for further proceedings, including consideration of whether all of the requirements of the wrongful lis pendens statute are met. *See* Utah Code Ann. § 78B-6-1304.5 (LexisNexis 2018) ("A person is liable to the record owner of real property . . . that is damaged by the maintenance of a notice of pendency . . . if the person records or causes to be recorded a notice of pendency against the real property, knowing or having reason to know that: . . . the notice is groundless . . . ."); *see also Commercial Inv. Corp. v. Siggard*, 936 P.2d 1105, 1111 (Utah Ct. App. 1997) ("A claim of interest in real property is groundless if it has no arguable basis or is not supported by any credible evidence." (quotation simplified)).

### C. Intentional Infliction of Emotional Distress

¶56    The district court also dismissed Kent's counterclaim for intentional infliction of emotional distress (IIED) on its merits, determining that the conduct Kent described as the basis for his claim was not, as a matter of law, sufficiently outrageous to meet the requirements of the cause of action. Kent appeals this determination, and we conclude that the district court correctly dismissed this claim on its merits.

¶57    In Utah, "a claim for IIED is actionable if: (i) the defendant's conduct is outrageous and intolerable; (ii) the defendant intends to cause emotional distress; (iii) the plaintiff suffers severe emotional distress; and (iv) the defendant's conduct proximately causes the plaintiff's emotional distress." *Wilson v. Sanders*, 2019 UT App 126, ¶ 18, 447 P.3d 1240 (quotation simplified), *petition for cert. filed*, Sept. 18, 2019 (No. 20190781). However, "it is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *Schuurman v. Shingleton*, 2001 UT 52, ¶ 23, 26 P.3d 227 (quotation

simplified). "Conduct is not necessarily outrageous merely because it is tortious, injurious, or malicious, or because it would give rise to punitive damages, or because it is illegal." *Bennett v. Jones, Waldo, Holbrook & McDonough*, 2003 UT 9, ¶ 64, 70 P.3d 17 (quotation simplified). "To be considered outrageous, the conduct must evoke outrage or revulsion; it must be more than unreasonable, unkind, or unfair." *Id.* (quotation simplified). Indeed, in order to prevail on a claim for IIED, a plaintiff must be able to prove that the defendant engaged in "extraordinarily vile conduct, conduct that is atrocious, and utterly intolerable in a civilized community." *Retherford v. AT&T Commc'ns*, 844 P.2d 949, 977 n.19 (Utah 1992) (quotation simplified).

¶58 Generally, sharp negotiation tactics, including threats of litigation, do not constitute the sort of behavior that our law considers sufficiently "outrageous" to sustain a cause of action for IIED. *See Bennett*, 2003 UT 9, ¶ 66 ("An allegation of improper filing of a lawsuit or the use of legal process against an individual is not redressable by a cause of action for [IIED]."). Moreover, "an ordinary business dispute should not be the subject of legally recognizable claims" for IIED. *See* 86 C.J.S. *Torts* § 57 (2019); *see also Mavromatis v. Lou-Mar, Inc.*, 632 So. 2d 828, 835 (La. Ct. App. 1994) (holding that a dispute over control of a family-owned business—including allegations that one party had failed "to properly value the . . . children's stock," had refused "to allow them proper access to corporate books and records," and had attempted "to reduce the purchase price for their stock"—"describe[d] a perfectly ordinary business dispute," and that "[s]uch disputes are an everyday aspect of commercial life and should not be the subject of legally recognizable claims" for IIED).

¶59 In our view, even viewing the facts of this case in the light most favorable to Kent, Stephanie's aggressive actions in attempting to apply "pressure" on Kent in order to gain control of the family restaurant business are not sufficiently outrageous

to support a claim for IIED. We acknowledge that Kent does appear to have actually suffered emotional distress, at least in part as a result of the overall dispute with Stephanie; indeed, he attempted suicide and spent time in the hospital. But even if Stephanie's conduct, viewed in the light most favorable to Kent, was aggressive and not particularly reasonable, the district court got it right when it held that Stephanie's conduct "does not, in itself, rise to the level of extreme and outrageous conduct so as to permit recovery" by Kent on a claim for IIED. Delivering strongly worded demand letters (even to people who are hospitalized), making negotiation demands that the other side views as unreasonable, and making corporate decisions such as terminating board members and withholding rent payments are not—at least not on this record—the type of "extraordinarily vile" actions that the law views as "utterly intolerable in a civilized community." *See Retherford*, 844 P.2d at 977 n.19.

¶60 Accordingly, we affirm the district court's order dismissing Kent's IIED claim.[12]

D.      Attorney-Client Privilege Issues

¶61 Finally, Kent takes issue with the district court's apparent ruling that Stephanie had not, after all, completely waived the attorney-client privilege with regard to communications she had

---

12. Kent also appeals the dismissal of his claim for breach of fiduciary duty, but does so only conditionally, asserting that his claim for breach of fiduciary duty "should be revived if Stephanie's breach of fiduciary duty claim is revived." Because, as stated above, we are not allowing Stephanie to revive her claim for breach of fiduciary duty due to the stipulation agreed upon in open court, Kent's conditional appeal is rendered moot. Both sides agreed to dismiss their respective claims for breach of fiduciary duty, and both sides should be held to that agreement.

with the two attorneys at New Firm whom Stephanie disclosed as relevant witnesses in her initial disclosures, and that Kent would not be allowed to use those communications at trial.[13]

¶62    The attorney-client privilege operates as a way "to encourage candor between attorney and client and to promote the best possible representation of the client." *Terry v. Bacon*, 2011 UT App 432, ¶ 14, 269 P.3d 188 (quotation simplified); *see also* Utah Code Ann. § 78B-1-137(2) (LexisNexis Supp. 2019) ("An attorney cannot, without the consent of the client, be examined as to any communication made by the client to the attorney or any advice given regarding the communication in the course of the professional employment."); Utah R. Evid. 504(b)(1) (stating that "[a] client has a privilege to refuse to disclose . . . confidential communications" with their counsel if those communications "were made for the purpose . . . of obtaining or facilitating the rendition of legal services to the client").

¶63    However, a client may waive the privilege if he or she "discloses or consents to the disclosure of any significant part of the matter or communication." Utah R. Evid. 510(a)(1). One common way to waive the attorney-client privilege is to place "at issue" in litigation matters that implicate attorney-client communications. *See Terry*, 2011 UT App 432, ¶ 16 ("When a

---

13. As alluded to above, we are not sure that the district court actually ruled that Stephanie had not waived the privilege, given the last sentence of its second privilege ruling stating that "[t]he information from [New Firm] attorneys has been waived by both sides." But Kent interprets the district court's ruling as one recognizing the existence of the privilege—at least insofar as Stephanie's own issues are concerned, and at least insofar as regards Kent's ability to use the privileged information at trial— and in order to clear up any confusion on remand, we proceed to address the district court's ruling as Kent interprets it.

party places privileged matters at issue in the litigation, that party implicitly consents to disclosure of those matters." (quotation simplified)); *see also Krahenbuhl v. The Cottle Firm*, 2018 UT App 138, ¶ 9, 427 P.3d 1216 ("The 'at issue' waiver is triggered when the party seeking application of the attorney-client privilege places attorney-client communications at the heart of a case" (quotation simplified)); 2 Paul R. Rice, *Attorney-Client Privilege in the United States* § 9:55, at 488–89 (5th ed. 2018) (noting that, when a party places at issue matters requiring the disclosure of attorney-client communications, the privilege is waived in order to avoid "permitting the privilege holder from placing the opposing party in an untenable position by injecting an issue into the litigation and then hiding behind the privilege to preclude its fair and complete resolution").

¶64 Early in the case, in rejecting the two attorneys' objections to Kent's subpoenas, the district court ruled that Stephanie waived the attorney-client privilege, at least as to matters raised in the pleadings, when she listed her attorneys as witnesses whom she expected to call in her case-in-chief. Indeed, in her initial disclosures, Stephanie broadly announced that both of the listed attorneys had general "knowledge concerning matters in the pleadings," and stated in particular that one of them had specific knowledge about the damages caused to TTR, and the other had specific knowledge about "Ennenga's breaches of duty to TTR and Stephanie." Although the court's initial discovery ruling regarding the scope of the waiver was unqualified, in its later ruling on Stephanie's motion in limine the court determined that the waiver was limited, and did not necessarily apply during the trial phase of the case.

¶65 In defending the district court's motion in limine ruling preventing Kent from using the privileged information at trial, Stephanie argues that the district court's original waiver ruling was incorrect, and that "[n]othing in [her] disclosure suggested a waiver of the attorney-client privilege." But Stephanie

misunderstands the effect of her broad witness disclosures. In this case, those disclosures constituted a waiver of her attorney-client privilege as to communications with the two listed lawyers. When Stephanie identified her two attorneys as witnesses whom she planned to call at trial to testify about "matters in the pleadings," she placed the attorneys' knowledge—about all matters raised in the pleadings—at issue in the litigation. *See Sempra Energy v. Marsh USA, Inc.*, No. CV 07–5431 SJO (SSx), 2008 WL 11338481, at *2 (C.D. Cal. July 25, 2008) ("If a party indicates that it intends to call its attorneys as witnesses, the attorney-client privilege may be waived."); *Aspex Eyewear, Inc. v. E'Lite Optik, Inc.*, 276 F. Supp. 2d 1084, 1094 (D. Nev. 2003) ("[O]nce a client decides to call the attorneys as witnesses, the [privilege] must give way to full disclosure on any issue to which they will testify."); *Rutgard v. Haynes*, 185 F.R.D. 596, 601 (S.D. Cal. 1999) ("Plaintiff has waived the attorney-client privilege between himself and [his lawyer] by indicating the intent to use [his lawyer] as a witness."); *cf. State v. Johnson*, 2008 UT App 5, ¶ 22, 178 P.3d 915 (holding that a defendant who stipulated to the admission of a witness statement from one of his attorneys had waived the privilege).

¶66 Our conclusion is driven, in part, by the breadth of Stephanie's disclosure. It is possible, of course, to introduce an attorney's testimony for only one discrete purpose—for instance, to bolster an advice of counsel defense, or to have an attorney rebut a claim that a suit was brought in bad faith. *See, e.g.*, *Aspex Eyewear*, 276 F. Supp. 2d at 1094 (noting that the waiver applies to "any issue to which [the attorneys] will testify"); *Handgards, Inc. v. Johnson & Johnson*, 413 F. Supp. 926, 929 (N.D. Cal. 1976) (holding that defendants waived attorney-client privilege as to the reasons why lawsuits were brought when they called their own attorneys as witnesses to demonstrate that the lawsuits were initiated in good faith pursuant to competent legal advice). But Stephanie designated her attorneys as witnesses competent to testify about "matters in the pleadings," and did not limit her

disclosure to any particular issue or issues. Based on this broad disclosure, Kent was entitled to conduct discovery, including by subpoena and deposition, into knowledge the attorneys might have regarding the issues raised in the pleadings, including discovery into communications that might otherwise have been privileged absent Stephanie's disclosure. Thus, in our view, the district court's initial discovery ruling—sustaining Kent's Statement of Discovery Issues and allowing discovery along these lines—was correct.

¶67 But this does not end our analysis. The basis for the district court's motion in limine ruling was its apparent belief that Stephanie's waiver of privilege for discovery purposes did not necessarily carry over into the trial phase of the litigation. In this, the district court was incorrect. As Kent points out, once the attorney-client privilege has been waived and information is disclosed pursuant to that waiver, it is no longer possible to undo that waiver and reassert the privilege. *See United States v. Suarez*, 820 F.2d 1158, 1160 (11th Cir. 1987) ("[I]t has long been held that once waived, the attorney-client privilege cannot be reasserted."); *see also Genentech, Inc. v. United States Int'l Trade Comm'n*, 122 F.3d 1409, 1416 (Fed. Cir. 1997) ("Once the attorney-client privilege has been waived, the privilege is generally lost for all purposes and in all forums."); *Patrick v. City of Chicago*, 154 F. Supp. 3d 705, 711 (N.D. Ill. 2015) ("[I]nformation once disclosed to a party opponent waives the attorney-client privilege as to future proceedings."); 2 Paul R. Rice, *Attorney-Client Privilege in the United States* § 9:23, at 86 (5th ed. 2018) ("Once there has been a waiver and the confidentiality upon which the privilege is premised has been relinquished, the privilege cannot be revived either in subsequent stages of the action in which the waiver occurred or in future actions."). Thus, Stephanie's efforts later in the litigation—after her attorneys' documents had been produced and the attorneys had been deposed—to withdraw her previous waiver of the privilege and to attempt to prevent Kent

from using the disclosed information at trial, was improper. Once Stephanie waived the privilege, it remained waived for the entirety of the case; the district court was incorrect to the extent it concluded that a litigant can waive the privilege for purposes of discovery, and then take back that waiver for purposes of trial. While a different question may have been presented had Stephanie amended her disclosures and taken the attorneys off the witness list before discovery had even begun, Stephanie should not have been allowed to reconsider her waiver more than a year later, after the completion of discovery and after Kent had already learned potentially privileged information.

¶68   This is not to say that Stephanie's waiver was universal; certainly, disclosing the attorneys as witnesses with regard to matters raised in the pleadings does not necessarily effect a waiver as to matters *not* raised in the pleadings. And this is not to say that all of the privileged matters subject to the waiver will be admissible in the litigation to follow upon remand; there remain only three claims to be litigated upon remand, and much of the privileged information to which the waiver applies may not be relevant to the remaining claims, and other evidentiary objections may be warranted with regard to particular documents or communications.

¶69   But these will be issues for the district court to resolve on remand. It suffices here to clarify that Stephanie waived the attorney-client privilege with regard to "matters raised in the pleadings" as concerns the two listed attorneys, and that waiver applies just as much to the trial phase of the case as it did to the discovery phase of the case. Therefore, the attorney-client privilege presents no bar to either side's attempt to utilize, in further proceedings on remand, communications between Stephanie and the two listed lawyers that concern matters raised in the pleadings.

CONCLUSION

¶70　The district court correctly dismissed most of the claims brought by both sides in this lawsuit. In particular, we affirm the district court's dismissal of Stephanie's claims for legal malpractice, fraud, and breach of fiduciary duty, and Kent's claims for breach of fiduciary duty and IIED. However, we conclude that each side has at least one claim that should not have been dismissed on the motions filed. Specifically, we reverse the district court's dismissal of Stephanie's claim for unjust enrichment and Kent's claims for wrongful lien and NIED, and we remand for further proceedings on those claims. And in those further proceedings, the attorney-client privilege will present no bar to either side's attempt to utilize communications, concerning matters raised in the pleadings, between Stephanie and the two attorneys she listed as witnesses in her initial disclosures.

―――――――――