2008 UT App 207

**BURTON LUMBER & HARDWARE COMPANY, Plaintiff and Appellee,**

v.

**Michael GRAHAM, Defendant and Appellant.**

**No. 20060912–CA.**

Court of Appeals of Utah.

May 30, 2008.

See also 2006 WL 302411.

David G. Harlow, Provo, for Appellant.

Richard D. Burbidge, Salt Lake City, for Appellee.

Before Judges BENCH, DAVIS, and ORME.

## OPINION

DAVIS, Judge:

¶ 1 Defendant Michael Graham appeals from the trial court's judgments, which awarded actual damages, punitive damages, and attorney fees and costs to Burton Lumber & Hardware Company (Burton Lumber). We affirm.

## BACKGROUND

¶ 2 Graham owned and operated a business that manufactured wall panels for residential housing. Burton Lumber and Graham entered into an agreement (the Agreement) whereby Burton Lumber purchased Graham's wall panel plant and agreed to employ Graham as the general manager of the plant. During the drafting of the Agreement, Graham, who was advised by an attorney and a CPA, tried to negotiate different employment terms but eventually agreed that he would be an at-will employee who could be terminated without cause at any time. Under the Agreement, Burton Lumber was to pay a fixed price for the business assets and inventory, as well as a salary, quarterly bonuses, and half of the plant's profits over the following three years to Graham. Burton Lumber was also to assume Graham's obligations under the lease for the building where the plant was located. The Agreement was finalized, and Burton Lumber took ownership of the plant on March 19, 2001.

¶ 3 In late July 2001, it appeared from Burton Lumber's records that one of its customers, Hamlet Homes, had failed to make payment for two invoices. Burton Lumber began to look into the matter, and Hamlet Homes responded by submitting a copy of the check it had used to pay those invoices. Graham's superiors at Burton Lumber talked with Graham, who claimed to not know what had happened to the check. After further investigation, Burton Lumber discovered that Graham had picked up the check for $7,293 from Hamlet Homes in early June 2001, had cashed it, and had deposited part of it into his wife's bank account and the remainder into his account.

¶ 4 Thereafter, in August 2001, the president and vice-president of Burton Lumber met with Graham to confront him about the check and to terminate him. Graham eventually admitted that the check belonged to Burton Lumber and stated that he would repay the amount within three days; he also agreed to turn in the company truck he had been using. Graham did neither, although Burton Lumber was eventually able to recover the truck. Burton Lumber also sent Graham a letter proposing to apply his final salary check toward the amount he owed and requesting that Graham respond if he did not agree with such action. Graham never replied, and as a result, his salary check was applied to his debt. According to the Agreement, because Graham was terminated, he was no longer entitled to his unaccrued bonus for the third quarter or any of the promised future shares of the plant's profits (although no such profits were realized in any event.)

¶ 5 After Graham was terminated, he took several items that, according to the Agreement, belonged to Burton Lumber. Additionally, sometime after Graham's termination, Burton Lumber determined that Graham had been paid for expense reimbursements that were not proper business expenses. Burton Lumber also learned that while Graham was employed as the plant's general manager, he had been personally renting a generator to contractors on Burton Lumber jobs. On at least one occasion, Graham included the rental amount on a bid and Burton Lumber ended up collecting for the rental. Graham then had a subcontractor make a phony invoice to Burton Lumber for

the rental charge amount. Burton Lumber issued a check to the subcontractor, who wrote Graham a check for that amount. Thus, Graham received a secret, improper payment from the job.

¶ 6 On September 7, 2001, Graham served a notice to vacate on Burton Lumber, demanding that Burton Lumber vacate the plant building by October 1, 2001. Although Burton Lumber had agreed to assume the lease obligations, it agreed to vacate but notified Graham that it would need a few more weeks beyond the deadline to completely vacate. Graham agreed, and Burton Lumber moved the plant into a bigger building on October 25, 2001, having paid all the October 2001 rent.

¶ 7 Burton Lumber brought this action to recover the several amounts owed by Graham, including the remaining portion of the Hamlet Homes check, the value of the converted property, the secret payment, and the improperly claimed business expenses. Burton Lumber further claimed that Graham had defrauded it into purchasing his business. In its complaint, Burton Lumber also requested awards of punitive damages and attorney fees. Graham responded and counter-claimed, arguing that the Agreement is unconscionable, his termination was in bad faith and without cause, Burton Lumber converted his personal property, Burton Lumber was unjustly enriched, and Burton Lumber damaged and did not timely vacate the plant building. After a summary judgment proceeding in which the trial court dismissed Graham's claim that the Agreement is unconscionable, the remaining claims were tried in November 2004. The trial court entered judgment in favor of Burton Lumber on all its claims with the exception of its fraud and improper reimbursement claims. The trial court also determined that Burton Lumber was entitled to punitive damages and attorney fees, which amounts were determined after an evidentiary hearing on those matters. Graham now appeals virtually every trial court determination in favor of Burton Lumber.

## ISSUES AND STANDARDS OF REVIEW

¶ 8 The bulk of Graham's arguments on appeal challenge the trial court's factual findings. "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Utah R. Civ. P. 52(a). " 'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *State v. Walker,* 743 P.2d 191, 193 (Utah 1987) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)).

¶ 9 Graham also argues that the Agreement, or at least one paragraph of it, is unconscionable. This is a question of law, which we review for correctness. *See Sosa v. Paulos,* 924 P.2d 357, 360 (Utah 1996).

¶ 10 Graham additionally challenges the award of punitive damages to Burton Lumber. "Whether punitive damages [should be] awarded is generally a question of fact within the sound discretion of the [fact finder], and will not be disturbed absent an abuse of discretion." *ProMax Dev. Corp. v. Mattson,* 943 P.2d 247, 259 (Utah Ct.App. 1997) (alterations in original) (internal quotation marks omitted).

¶ 11 Finally, Graham argues that the trial court erred in awarding attorney fees under Utah Code section 78–27–56, which allows attorney fees to be awarded against a party whose action or defense is without merit and is brought in bad faith, *see* Utah Code Ann. § 78–27–56(1) (2002). This is a mixed question of fact and law: "As to whether the party lacked good faith, the trial court must make a factual finding of a party's subjective intent. In addition, the trial court must conclude, as a matter of law, that the action was without merit." *Pennington v. Allstate Ins. Co.,* 973 P.2d 932, 939 n. 3 (Utah 1998).

## ANALYSIS

### I. The Challenged Findings of Fact

¶ 12 Many of Graham's arguments are, either directly or indirectly, challenges

to the trial court's findings of fact. To successfully challenge such findings, "an appellant must first marshal all the evidence supporting the finding[s] and then demonstrate that the evidence is legally insufficient to support the findings even in viewing it in the light most favorable to the court below." *Reid v. Mutual of Omaha Ins. Co.*, 776 P.2d 896, 899 (Utah 1989); *see also* Utah R.App. P. 24(a)(9).

> The process of marshaling is ... fundamentally different from that of presenting the evidence at trial. The challenging party must temporarily remove its own prejudices and fully embrace the adversary's position; he or she must play the devil's advocate. In so doing, appellants must present the evidence in a light most favorable to the trial court and not attempt to construe the evidence in a light favorable to their case. Appellants cannot merely present carefully selected facts and excerpts from the record in support of their position. Nor can they simply restate or review evidence that points to an alternate finding or a finding contrary to the trial court's finding of fact.

*Chen v. Stewart*, 2004 UT 82, ¶ 78, 100 P.3d 1177 (citations and internal quotation marks omitted).

 ¶ 13 Graham wholly fails to fulfill the "rigorous and strict" marshaling requirement, *see id.* ¶ 79. In some instances, he does not even directly challenge the findings of fact but, rather, in making his legal arguments implies that the findings were opposite of that which the trial court actually found. For those findings that Graham *does* directly challenge, he essentially reargues the evidence and asserts that the findings are incorrect because the evidence supporting them is "self-serving" and "controverted."[1] But such recharacterizations of the evidence are ineffectual on appeal because it is the trial court's role to assess credibility and to assign weight to conflicting evidence. *See 438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 75, 99 P.3d 801 ("When reviewing a district court's findings of fact on appeal, we do not under-

take an independent assessment of the evidence presented during the course of trial and reach our own separate findings with respect to that evidence. Rather, we endeavor only to evaluate whether the court's findings are so lacking in support that they are against the clear weight of the evidence."). Thus, because Graham makes no real attempt to properly marshal the evidence, we accept all the trial court's findings. *See Chen*, 2004 UT 82, ¶ 80, 100 P.3d 1177. Further, we refuse to address any of Graham's legal arguments that are entirely dependent on a version of the facts that is contrary to the trial court's findings. In the interest of clarity, however, we set forth such legal arguments and the related factual findings that render these arguments unavailing.

¶ 14 Graham contests the trial court's ruling in favor of Burton Lumber on the issue of the Hamlet Homes check. He argues that Burton Lumber's theories of conversion, unjust enrichment, breach of contract, and breach of fiduciary duty fail because the check belonged to Graham and the wall panels that the check covered were produced prior to Graham's employment with Burton Lumber. However, the trial court specifically found that (1) "[t]he Agreement closed on March 19, 2001, at which time Burton Lumber took over ownership operations and Graham became General Manager of the wall panel plant"; (2) "[a]ll business done commencing March 19, 2001 was Burton Lumber business done for its benefit"; (3) the selections that must have been made before the work underlying the Hamlet Homes check could commence were not completed until March 28 or March 29, 2001; and (4) the Hamlet Homes check "clearly belonged to Burton Lumber."

 ¶ 15 Graham argues that he did not breach his fiduciary duties to Burton Lumber through the generator rental. He claims that there was "nothing secret" about the rental and that such rentals were consistent with his duty to act primarily for the benefit of Burton Lumber. But the trial court found that "Graham did not request or receive per-

---

1. Graham also provides us with more than twenty "unreceived" exhibits. We cannot consider such documents in our inquiry into whether *"the*

*evidence* is legally insufficient to support the findings," *Reid v. Mutual of Omaha Ins. Co.*, 776 P.2d 896, 899 (Utah 1989) (emphasis added).

mission from Burton Lumber to rent generators on Burton Lumber jobs and Graham's superiors at Burton Lumber had no knowledge he was doing so." The court then concluded that "[b]y this subterfuge, Graham received a secret profit ... on a Burton Lumber job and usurped a corporate opportunity of Burton Lumber." [2]

¶ 16 Graham next contests the trial court's determination that he converted Burton Lumber property, arguing that the property was his and that, instead, Burton Lumber improperly retained some of *his* property. The trial court, however, found that (1) "[u]nder the Agreement, Burton Lumber acquired all of the assets of the wall panel business except amounts receivable and personal assets of Graham such as his 'home, furniture, cars, and clothing'"; [3] (2) Graham had indicated that other business assets were included in the transaction beyond those specifically listed in the asset schedule; and (3) Graham took possession of several items belonging to Burton Lumber under the Agreement. [4]

 ¶ 17 Graham argues that Burton Lumber improperly retained his last paycheck. The trial court found that Burton Lumber notified Graham that it intended to apply the paycheck to the amount owed by Graham for keeping the Hamlet Homes money and that "Graham did not object." [5] The trial court then properly offset that amount against the award given for Graham taking the Hamlet Homes check.

¶ 18 Graham next contends that he should have been awarded his quarterly bonus, premium compensation, and profit shares because Burton Lumber breached its duty of good faith and fair dealing by terminating him "in order to avoid paying [contract] amounts." The trial court found the opposite: "Burton Lumber acted in good faith in terminating Graham based on its good faith and reasonable belief ... that Graham had embezzled the Hamlet [Homes] check." The court specifically found that (1) "Burton Lumber did not terminate Graham to avoid paying him a share of the wall panel plant profits (of which there were none)," [6] (2)

2. Graham also makes a waiver argument regarding this issue, which argument is misplaced. Waiver requires "an intention to relinquish" a known right. *Geisdorf v. Doughty*, 972 P.2d 67, 72 (Utah 1998). There is no indication that Burton Lumber intended to relinquish its right to recover from Graham by not accepting payment on behalf of Graham by a third party.

3. To the extent that this is an interpretation of the Agreement, which is a legal question, there is no error here. The Agreement specifically provides in Paragraph 1.6: "Except for accounts receivable and personal assets of Graham such as his home, furniture, cars, and clothing there are no excludable assets. [Burton Lumber] is purchasing all assets of [Graham]." The items taken by Graham, including office computer equipment and several tools, were not such personal items.

4. Graham specifically suggests that the award to Burton Lumber for the lease expense of his company truck was granted under a theory of breach of oral contract, which he argues was based on his statement that he would return the truck. But the trial court's determination was not based on Graham's breach of an oral contract resulting from that statement but, rather, was based on his breach of the Agreement.

5. It is not clear whether Graham's argument is a challenge to the court's finding that he acquiesced to Burton Lumber keeping his paycheck. Indeed, several of Graham's arguments are imprecise as to the exact errors being alleged, providing, at best, very cursory analyses. This argument regarding Graham's paycheck is a prime example, consisting of a one-sentence assertion that the action on the part of Burton Lumber was improper. Such an argument does not comply with appellate briefing rules. *See* Utah R.App. P. 24(a)(9) (requiring an appellant's argument to "contain the contentions and reasons of the appellant with respect to the issues presented"); *West Jordan City v. Goodman*, 2006 UT 27, ¶ 29, 135 P.3d 874 ("This court is not a depository in which the appealing party may dump the burden of argument and research. An adequately briefed argument must provide meaningful legal analysis. A brief must go beyond providing conclusory statements and fully identify, analyze, and cite its legal arguments. This analysis requires not just bald citation to authority but development of that authority and reasoned analysis based on that authority." (footnotes and internal quotation marks omitted)). We warn that such noncompliance may have serious consequences because we have the discretion to strike the noncompliant arguments and "assess attorney fees against the offending lawyer." Utah R.App. P. 24(k).

6. Graham's related claim that there would have been more profits had Burton Lumber replaced him with a more experienced manager is unavailing. As the findings support, Graham was never entitled to profits even if some had been realized.

"Burton Lumber had just cause for terminating [Graham] for dishonesty," and (3) "Burton Lumber's decision to terminate Graham was not based on any advice or recommendation from [a consulting group]."

¶ 19 In addition to his claim that the Hamlet Homes check belonged to him, Graham also claims that there were six other Hamlet Homes jobs that should have been paid to him because they were completed before Burton Lumber acquired his wall panel business. The trial court found that "each of these jobs was in fact a Burton Lumber job and that Graham is not entitled to recover any sums relating to these jobs"; indeed, the court set forth three pages of evidence supporting such findings.[7]

¶ 20 Graham sets forth a one-sentence argument that he should have been allowed "continued use and possession of the truck." The trial court found that under the Agreement, Graham was entitled to keep the truck only if he was terminated "without just cause." Because the court had already determined that Graham was terminated for cause, it concluded that he had no right to the truck.[8]

¶ 21 Graham argues that Burton Lumber failed to satisfy all of the lease obligations it assumed under the Agreement. However, the trial court found that (1) "Burton Lumber did in fact assume and pay Graham's ongoing obligations under the lease, including the monthly lease payments"; (2) Graham requested Burton Lumber to vacate the panel plant; (3) Burton Lumber complied

and vacated on October 25, 2001; and (4) Burton Lumber paid the lease payment for October 2001. As to damages to the panel plant, the court specifically found:

> Burton Lumber did not do any damage to the panel plant. Any damage to the panel plant had been done ... before Burton Lumber acquired the panel plant. Moreover, at the time Graham claims damage was done to the panel plant, he was the General Manager of the plant and responsible for its care and maintenance.

## II. Unconscionability

¶ 22 Paragraph 7.4 of the Agreement reads: "If the employment of Graham is terminated for any reason, he will immediately forfeit any unpaid portion of the remaining contingent deferred purchase price specified in Paragraph 2.2 above, plus he will no longer be entitled to any continuing salary, allowances, and bonuses." Graham argues that this paragraph is unconscionable and unenforceable because it allows Burton Lumber to fire him to avoid paying him what was, essentially, part of the purchase price for his business.

¶ 23 There are two branches of unconscionability—procedural unconscionability and substantive unconscionability. *See generally Sosa v. Paulos,* 924 P.2d 357, 360 (Utah 1996). Procedural unconscionability, which addresses the circumstances of the parties and the way in which the contract was negotiated, *see id.* at 362, is not asserted

---

7. Graham cites selected excerpts from a summary judgment ruling, whereby he implies that the trial court determined that the parties mutually breached the Agreement during the weeks between the signing of the Agreement on March 6 and the completion of the takeover on April 1. This is a mischaracterization of the ruling. Although the trial court noted that the facts *"suggest* a mutual breach of contract," the court determined only that "[t]here is much debate concerning ownership of contracts completed by the panelization plant in the window of time between March 6 and April 1" and that summary judgment was inappropriate on this issue. (Emphasis added.)

8. To the extent that this is another contract interpretation issue, we see no error. The contract states:

> If Graham quits his employment with [Burton Lumber], he shall have no right to continue to use ... the truck and must surrender possession of the truck to [Burton Lumber] immediately. If Graham is fired without just cause, he shall be entitled to keep the truck and [Burton Lumber] will deliver title to the truck to him free and clear of all liens and/or encumbrances.

We think it a correct interpretation that if Graham was fired for cause, i.e., his actions essentially terminated his employment, then he would not be allowed to keep the truck. The opposite conclusion would be nonsensical, requiring return of the truck if Graham chose to leave but allowing him to keep the truck if he committed actions, such as the embezzlement that occurred here, which led to him being terminated for cause.

in this case. Rather, Graham argues that there exists substantive unconscionability in Paragraph 7.4 of the Agreement sufficient to support a finding of unconscionability.

¶ 24 The Utah Supreme Court has previously instructed that " '[g]ross disparity in terms, absent evidence of procedural unconscionability, can support a finding of unconscionability.' " *Id.* at 361 (quoting *Resource Mgmt. Co. v. Weston Ranch,* 706 P.2d 1028, 1043 (Utah 1985)). Nonetheless,

> [a] party claiming unconscionability bears a heavy burden. The law enables parties to freely contract, establishing terms and allocating risks between them. The law even permits parties to enter into unreasonable contracts or contracts leading to a hardship on one party....
>
> ... [Thus,] if a contract term is unreasonable or more advantageous to one party, the contract, without more, is not unconscionable-the terms must be "so one-sided as to oppress ... an innocent party."

*Ryan v. Dan's Food Stores, Inc.,* 972 P.2d 395, 402 (Utah 1998) (citations omitted) (quoting *Sosa,* 924 P.2d at 361). The terms of the Agreement do not embody a gross disparity. We cannot say that the Agreement, or parts thereof, are one-sided where the trial court found that Burton Lumber paid up-front for the fixed assets and inventory of Graham's business and where Graham was simply deprived of the Agreement's "contingent deferred" payments if he was no longer working for Burton Lumber.[9] Because Graham has not met his burden to show that the Agreement, in whole or in part, is unconscionable, we affirm the trial court on this matter.

¶ 25 Graham also argues that the Agreement is unconscionable because at-will employment is subject to modification where additional consideration is provided by the employee. But the case to which Graham cites explains that "[t]o satisfy the 'good consideration' exception ..., [the employee] would have had to offer [his employer], at its request, something more than what he was already obligated to do under his employment agreement, not just a continuation of the duties he was required to perform." *Rose v. Allied Dev. Co.,* 719 P.2d 83, 86 (Utah 1986). Here, there was no consideration given beyond those obligations set forth in the Agreement. Further, Paragraph 7.1, which states that Graham will be an at-will employee, specifically provides that "nothing contained in [the] Agreement or in any other document shall have the effect of altering or changing Graham's status as an employee at will."

### III. Punitive Damages

¶ 26 Graham argues that the punitive damages award was improper because Burton Lumber's only claim for punitive damages was confined to its fraud claim, which was dismissed. We do not agree, however, that the request for punitive damages was so narrow. In its complaint, Burton Lumber generally requested punitive damages for Graham's actions. Graham bases his argument on one reference to Burton Lumber's trial brief, in which punitive damages are discussed in context of the fraud claim; but even in that trial brief, Burton Lumber stated that it was requesting punitive damages "under theories of fraud, conversion, unjust enrichment, breach of fiduciary duties and breach of contract."

¶ 27 Graham also argues that the punitive damages award was excessive. Graham argues that there have been no negative effects on Burton Lumber's net revenues or public opinion; that there has been no economic, emotional, or medical effect on Burton Lumber's owners or employees; and that there is little probability of Graham's misconduct re-

9. Although the Agreement allowed Burton Lumber to terminate Graham at any time, with or without cause, the covenant of good faith and fair dealing would likely prevent Burton Lumber from firing Graham for the sole purpose of avoiding the contingent deferred purchase price. *See Eggett v. Wasatch Energy Corp.,* 2004 UT 28, ¶ 16, 94 P.3d 193 ("Broadly speaking, the more leeway a party has under the terms of the contract, the more contracting parties may invoke the protections of the covenant of good faith and fair dealing in the exercise of that discretion."). But this issue is not before us because the trial court specifically found that Graham was fired because of his embezzling and not because Burton Lumber wanted to avoid the contingent payments under the contract. *See supra* ¶ 18.

occurring. Again, these issues are addressed in findings of fact that the trial court made and that we have declined to disturb on appeal. *See supra* ¶¶ 12–13. The trial court found that (1) Graham's annual income was approximately $40,000 and his net worth was approximately $12,000; (2) he embezzled money, obtained secret payments, and converted property of Burton Lumber; (3) such conduct was "reprehensible especially given the fiduciary duties that Graham owed to Burton Lumber as the General Manager of its wall panel plant"; (4) Graham lied to conceal his dishonesty; (5) "Graham then forced Burton Lumber to incur very substantial attorney[ ] fees to defend Graham's frivolous counterclaims, which Graham asserted in bad faith"; (6) Graham's wrongful prosecution and defense required Burton Lumber management and employees to spend "hundreds of hours" on the case, including time in numerous and lengthy depositions taken by Graham; (7) "there is a probability that Graham may engage in dishonest business conduct in the future"; (8) "Graham testified falsely at trial concerning his actions"; (9) Graham has never shown remorse for his actions; (10) the principal damages amount was $16,958; and (11) a punitive damages award of $34,000 was reasonable.

¶ 28 Regarding any issue as to whether the trial court considered the appropriate factors in its determination, the seven factors to be considered in determining whether a punitive damages award is excessive are

> (i) the relative wealth of the defendant; (ii) the nature of the alleged misconduct; (iii) the facts and circumstances surrounding such conduct; (iv) the effect thereof on the lives of the plaintiff and others; (v) the probability of future recurrence of the misconduct; (vi) the relationship of the parties; and (vii) the amount of actual damages awarded.

*Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 808 (Utah 1991). As the findings above show, the trial court considered each of these factors. Further, "the amount of a punitive damage award generally must bear a 'reasonable and rational' relationship to the actual damages" and not be " 'grossly disproportionate' to the actual damages awarded." *Id.* at 810. The award here, approximately double the amount of actual damages, was reasonable. *See id.* ("Generally, we have found punitive damage awards below $100,000 not to be excessive ... when the punitives do not exceed actual damages by more than a ratio of approximately 3 to 1.").

### IV. Costs and Attorney Fees

¶ 29 Graham asserts that costs and attorney fees were not properly awarded. But the trial court determined "that Graham's defense of Burton Lumber's claims on which it was successful and his prosecution of his counterclaims was in bad faith and that such defenses and claims were without merit." Thus, the court determined that attorney fees were proper under Utah Code section 78–27–56 because "all of Burton Lumber's fees were incurred because of Graham's bad faith assertion of all his counterclaims and his defenses to Burton Lumber's claims except his defenses to Burton Lumber's fraud and improper expense claims." *See generally* Utah Code Ann. § 78–27–56(1) (2002) ("In civil actions, the court shall award reasonable attorney[ ] fees to a prevailing party if the court determines that the action or defense to the action was without merit and not brought or asserted in good faith...."). Graham states that the evidence does not support the trial court's finding of bad faith, but then he discusses this assertion no further. Thus, we again accept the trial court's findings and its resulting determination. *See supra* ¶¶ 12–13.

¶ 30 Graham also argues that Burton Lumber's attorneys' invoices are lacking sufficient detail to determine which attorney fees were incurred for which issues, and that the trial court was essentially left to guess on this matter. He also claims that the evidence presented by Burton Lumber was not sufficient to show that the attorney fees were reasonable. However, there was ample evidence before the trial court to make these determinations. The trial court was provided with the hourly rates of Burton Lumber's attorneys and found such to be "reasonable and customary." The court also determined that Burton Lumber's attorney fees were

"substantially increased as a result of Graham's litigation strategy, including the taking of numerous lengthy depositions, requesting and receiving many thousands of pages of documents, and lengthy questioning of witnesses and calling at best tangentially relevant witnesses at trial which significantly lengthened the trial." Burton Lumber's primary attorney also testified in support of the time allocations on the invoices, which testimony the trial court apparently accepted as true notwithstanding Graham's claims that such evidence need not be accepted because the testimony was "self-serving."

¶ 31 Graham further alleges that in arriving at the attorney fees award no time was allocated to Burton Lumber's unsuccessful fraud and improper expense reimbursement claims. But the trial court *did* deduct from the attorney fee award an amount representing "more than the amount of time actually expended in pursuing the fraud claim." The court also found that "almost all, if not all, of the legal services performed with respect to the fraud claim were also relevant and necessary with respect to the other issues in the case upon which Burton Lumber was successful." And the court followed this finding with specific examples. The trial court also found that the amount involved in the improper expense reimbursement claim "was minimal." And again, the court found that "almost all, if not all, of the legal services devoted to this issue were necessary and relevant with respect to Graham's credibility." Moreover, although the trial court did not think it necessary to do so, the court determined, based upon the evidence before it, that a further fees reduction of $5000 would "more than compensate" for any fees arising from the improper expense reimbursement claim and any other unsuccessful motions. We therefore see no error with the award of attorney fees.

¶ 32 Graham also sets forth a one-sentence argument asserting that costs were improperly awarded because Burton Lumber's November 11, 2005 Memorandum of Costs and Disbursements was served on Graham before the judgment was entered and was therefore in violation of rule 54(d)(2) of the Utah Rules of Civil Procedure. *See generally* Utah R.

Civ. P. 54(d)(2) ("The party who claims his costs must within five days after the entry of judgment serve upon the adverse party against whom costs are claimed, a copy of a memorandum of the items of his costs and necessary disbursements in the action. . . ."). But the judgment was entered on November 7, 2005, so the timing of the Memorandum complied with rule 54(d)(2). *See id.*

¶ 33 In another one-sentence argument, Graham takes issue with the awarded costs related to various depositions, stating that these were not essential costs. However, the trial court ruled otherwise. The court explained the basis of the award:

> [T]his case presented a significant level of complexity that required counsel for [Burton Lumber] to depose numerous people in order to adequately prepare for trial and to provide the Court with the information necessary to appreciate the facts of this case. Furthermore, the Court notes the direct connection between these depositions and testimony presented at trial.

Insofar as Graham attempts to challenge these findings, we again do not address such a challenge based on his failure to marshal. *See supra* ¶¶ 12–13. Insofar as this was a legal challenge to whether these findings are sufficient to award deposition costs, the very case Graham cites, *Young v. State*, 2000 UT 91, 16 P.3d 549, would support the award given these findings. *See id.* ¶ 11 ("The trial court must find that the depositions were essential because they were used in a meaningful way at trial, or because the development of the case was of such a complex nature that the information in the depositions could not be obtained through less expensive means of discovery, before [a party] can recover these amounts as costs.").

¶ 34 Graham argues that he should be awarded his costs and attorney fees, not only the fees incurred from defending this action, but also, on a theory of consequential damages, for those costs and attorney fees incurred in defending against a case brought by the plant building's landlord and in defending against criminal charges. This argument rests upon Graham's assertion that Burton Lumber terminated him to avoid having to pay under Paragraph 7.4 of the Agree-

ment, which assertion is not consistent with the trial court's factual findings; and as discussed above, we do not disturb those findings. *See supra* ¶ 18. We therefore affirm the trial court's determination on this matter as well.

## CONCLUSION

¶ 35 Because Graham makes no real attempt to marshal the evidence supporting the challenged findings of fact, we accept all the facts found by the trial court. As to the legal issues Graham raises, we agree with the trial court that the Agreement is not unconscionable and that the awards of both punitive damages and attorney fees and costs were proper and reasonable. Affirmed.

¶ 36 I CONCUR: GREGORY K. ORME, Judge.

¶ 37 I CONCUR IN THE RESULT: RUSSELL W. BENCH, Judge.