2023 UT App 9

# THE UTAH COURT OF APPEALS

PHYLLIS NASSI,
Appellant,
*v.*
MARK HATSIS,
Appellee.

Opinion
No. 20210009-CA
Filed January 20, 2023

Third District Court, Salt Lake Department
The Honorable Su Chon
No. 190905541

Richard D. Burbidge, Beau R. Burbidge, Carolyn J.
LeDuc, and Michael S. Henderson, Attorneys
for Appellant

Rodney R. Parker and Adam M. Pace, Attorneys
for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGE DAVID N. MORTENSEN and JUSTICE JILL M. POHLMAN
concurred.[1]

TENNEY, Judge:

¶1     When Valter Nassi purchased a downtown condominium
in 2012, he was told that he could use a particular storage unit in
the basement. Over the next several years, Nassi placed tens of
thousands of dollars' worth of clothes inside that unit. When

---

1. Justice Jill M. Pohlman began her work on this case as a member
of the Utah Court of Appeals. She became a member of the Utah
Supreme Court thereafter and completed her work on this case
sitting by special assignment as authorized by law. *See generally*
Utah R. Jud. Admin. 3-108(4).

Mark Hatsis moved into a different condominium in this complex in 2018, however, he was told that this same storage unit was assigned to him. Upon discovering the clothes inside, he had them thrown away.

¶2    Nassi later sued Hatsis for conversion, trespass to chattels, and intentional infliction of emotional distress. In conjunction with those claims, he also asked for punitive damages. But the district court subsequently granted summary judgment in Hatsis's favor on all of Nassi's claims. Nassi appealed that decision, and though Nassi passed away while this appeal was pending, Phyllis Nassi, his wife, was substituted for him pursuant to rule 38(a) of the Utah Rules of Appellate Procedure.[2]

¶3    For the reasons set forth below, we reverse the district court's decision to grant summary judgment on the conversion and trespass to chattels claims, as well as on Nassi's request for punitive damages. But we affirm the district court's decision to grant summary judgment in Hatsis's favor on the intentional infliction of emotional distress claim.

## BACKGROUND[3]

¶4    Valter Nassi purchased a condominium in 2012, and the condominium complex had a number of "storage spaces" in the

---

2. For clarity, we note that any references to "Nassi" in this opinion refer to Valter Nassi, while any references to Phyllis Nassi will be more particularly designated.

3. When reviewing a district court's decision granting summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *See Ockey v. Club Jam*, 2014 UT App 126, ¶ 9, 328 P.3d 880. We

(continued…)

basement that were used by its residents. According to the covenants, conditions, and restrictions of the complex (the CC&Rs), the complex has "no obligation to provide any unit owner with [a] storage area other than [what] has been provided within each unit." But the CC&Rs also state that the "Board of Directors" has "discretion" to "designate storage areas within the condominium common areas." And over time, the Board of Directors' exercise of this discretion was apparently something short of formalized or clear. Instead, assignment for the various storage units was passed down from owner to owner in something akin to a loose word-of-mouth-based system.

¶5     When Nassi purchased his condominium in 2012, the previous owner told Nassi that storage units 3 and 6 were his "to use."[4] Nassi accordingly began using those storage units, and he continued to do so for the next several years. Of note, Nassi used unit 3 to store a large amount of clothing, including Italian suits, cashmere sweaters, and dress shirts.[5] In addition to their monetary value, some of these items of clothing had sentimental

accordingly describe the facts in the light most favorable to Nassi, as he was the nonmoving party.

4. When the previous owner was deposed as part of this case, he said that he didn't recall telling Nassi "anything about" unit 3, and he further noted that "it wouldn't have been [his] call to do that anyway." But because of the procedural posture, we assume for purposes of this appeal that Nassi was indeed told by the previous owner that unit 3 was his to use.

5. In his complaint, Nassi alleged that the items he'd put in unit 3 "include[d]," but were "not limited to, personal clothing." In the portions of the record provided to us on appeal, however, there's only a single passing reference to any item other than clothing. Regardless, our decision doesn't turn on a clothing/non-clothing distinction, so for narrative reasons only, we'll refer to the unit as having contained items of clothing.

value to him, including items that he'd brought from his native country and an item that had belonged to his deceased brother.

¶6     During subsequent proceedings in this case, Nassi said that he occasionally sprayed moth repellant in unit 3. But he also said that his clothes were in "plastic containers" or boxes and that none of them had been damaged by moths. And while he said that unit 3 sometimes smelled like moth repellant as a result of his spraying, he suggested that the clothes themselves didn't smell.[6] For her part, his wife later said that she never noticed a smell "of any kind" in unit 3 when she went into it to retrieve something for Nassi.

¶7     Nassi secured the items that he had placed in unit 3 by placing a lock on the door. He later estimated that the total value of what he had inside was "not less than $40,850."

---

6. During Nassi's deposition, the following exchange occurred:

Q: But would you agree that the clothes, you know, smelled like moth repellant?

A: Yeah, of course. I don't know if the smell was going inside the box. I don't recall that I smell.

There's something of an ambiguity in this answer (perhaps due to a slight language barrier). But while Nassi's initial response ("Yeah, of course") might be understood as an agreement that he thought the clothes smelled, his two later statements ("I don't know if the smell was going inside the box" and "I don't recall that I smell") seem to suggest that he didn't think the clothes that were inside the boxes smelled. As noted, since this case involves review of a summary judgment ruling for which Hatsis was the moving party, we must view this answer and all reasonable inferences drawn therefrom in the light most favorable to Nassi.

¶8    In October 2018, Mark Hatsis purchased condominium #201 in this same complex. Hatsis was informed by the previous owner that unit 3 "corresponded with" his condominium. When he found the lock on the door, he again verified from the previous owner that unit 3 was his to use. Hatsis then asked a handyman to remove the lock for him. Once inside unit 3, Hatsis found the clothes described above. Hatsis was "annoyed that [the previous owner] didn't leave a broom swept space for" him. Hatsis later said that he inspected the items for "about ten minutes" and saw no identifying information. Hatsis also said that he thought he smelled mothballs, which he took as a sign that the items were "old" and "toxic to touch." As a result, he allegedly concluded that the items belonged to a previous or deceased resident.

¶9    Hatsis instructed his housekeeper to "empty" unit 3 "by the end of the day," and he further "suggested" that she could throw the items into a nearby dumpster. His housekeeper complied with his instruction and threw the items away. In a subsequent deposition, his housekeeper said that the space smelled a "little bit" like mold when she cleaned it, but she also said that she thought that "basement[s] always have some smell."

¶10    Nassi soon discovered that his lock was gone and that the items he'd stored inside the unit were gone too. After learning what had happened, Nassi sued Hatsis for, among other things, conversion, trespass to chattels, and intentional infliction of emotional distress, and he also requested punitive damages.[7]

¶11    During discovery, Hatsis produced documents from both the condominium complex and the homeowners association that purported to establish that Nassi's condominium had been assigned storage units 2 and 6, as well as that it was Hatsis's condominium (not Nassi's) that had been assigned storage unit 3.

---

7. Nassi also brought claims for trespass to property and replevin, but he later voluntarily dismissed those claims, and they are not at issue in this appeal.

Hatsis also produced a photograph of unit 3's door, which showed a note on the door with the words "Gorey 201" written in black marker—an apparent reference to a prior owner of Hatsis's condominium who had the surname Gorey.

¶12    Hatsis later moved for summary judgment on all of Nassi's claims. With respect to the conversion and trespass to chattels claims, Hatsis argued that he was entitled to dispose of the property that he found inside unit 3 because the unit was assigned to him. Hatsis further argued that he was not liable on these claims because he "reasonably believed, based on his personal inspection of the clothing, that the clothing was valueless, toxic, and needed to be disposed of" since it had been abandoned.

¶13    With respect to Nassi's intentional infliction of emotional distress claim, Hatsis argued that his conduct was not purposefully directed toward Nassi and that it was not sufficiently outrageous as required to support such a claim. And with respect to the request for punitive damages, Hatsis likewise argued that his conduct was not sufficiently troubling to support a punitive damages award.

¶14    After receiving Nassi's response and hearing arguments from both parties, the district court granted Hatsis's motion for summary judgment. In its ruling, the court initially determined that there was no "dispute of material fact" that Nassi "did not have a legal right to use" unit 3. The court made this determination based on the records from the condominium complex and the homeowners association, as well as the "sign on the door" that Hatsis had found that had the name of a prior owner of his unit.[8]

---

8. In the proceedings before the district court, Nassi raised some question about whether this note was actually on the door at the time that Hatsis had the lock removed. Despite this, the district

(continued…)

¶15    In part based on this determination, the district court then granted Hatsis's request for summary judgment on each of Nassi's claims. First, with respect to Nassi's conversion and trespass to chattels claims, the court held that Hatsis was entitled to summary judgment because he "reasonably believed that the clothing had been abandoned and that his apartment had sole use of" unit 3. The court further opined that Hatsis was entitled to summary judgment because his "actions may [have been] reasonable under the circumstances."

¶16    With respect to Nassi's intentional infliction of emotional distress claim, the court held that Hatsis "had no legal obligation to track down the owner of clothing that smelled musty and appeared old and abandoned." In the court's view, although Nassi contended that Hatsis's decision to "dispos[e]" of his clothing was "very upsetting," Hatsis was entitled to summary judgment because his "actions were not extreme, outrageous, intolerable, or atrocious."

¶17    Finally, with respect to Nassi's request for punitive damages, the court concluded that because the intentional infliction of emotional distress claim "was dismissed, there are no grounds for punitive damages." Seemingly elaborating further, the court then recited the statutory standard, under which punitive damages are warranted when it is "established by clear and convincing evidence that the acts or omission[s] of the tortfeasor are the result of willful and malicious or intentionally

---

court accepted Hatsis's claim that the note was there as part of its summary judgment ruling.

    But summary judgment is warranted only when "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). To the extent that the court resolved this disputed fact at this stage in Hatsis's favor, this was improper. As set forth below, however, this dispute is immaterial to our ultimate resolution of the issues raised on appeal.

fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others." (Quoting Utah Code § 78B-8-201(1)(a).) The court then stated that Nassi was also required to show that Hatsis knew or should have known that his "conduct would, in a high degree of probability, result in substantial harm to another," as well as that his conduct was "highly unreasonable conduct, or an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." (Quoting *Nguyen v. IHC Health Services, Inc.*, 2010 UT App 85, ¶ 12, 232 P.3d 529.) Based on these standards, the court ruled that although "[t]his was an unfortunate situation," Nassi "ha[d] no legal grounds for recovery of punitive damages" because "he show[ed] no right to use [unit 3]" and because Hatsis "reasonably believed the clothes were left by a prior tenant of his apartment."

¶18   Nassi timely appealed the court's grant of summary judgment. As noted, Nassi passed away during the pendency of this appeal, and his wife has been substituted for him pursuant to rule 38(a) of the Utah Rules of Appellate Procedure.

ISSUE AND STANDARD OF REVIEW

¶19   Nassi challenges the district court's grant of summary judgment to Hatsis. "We review the district court's decision on summary judgment de novo." *Potter v. South Salt Lake City*, 2018 UT 21, ¶ 16, 422 P.3d 803 (emphasis omitted).

ANALYSIS

¶20   "Summary judgment is appropriate 'if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.'" *Jessup v. Five Star Franchising LLC*, 2022 UT App 86, ¶ 27, 515 P.3d 466 (quoting Utah R. Civ. P. 56(a)). A genuine dispute of material fact does not exist if "reasonable jurors, properly instructed,

would be able to come to only one conclusion." *Heslop v. Bear River Mut. Ins. Co.*, 2017 UT 5, ¶ 20, 390 P.3d 314 (quotation simplified). But if jurors "might come to different conclusions" after hearing the facts, then summary judgment is unwarranted. *Id.* (quotation simplified). Summary judgment is thus appropriate only when "no reasonable factfinder could rule in the nonmoving party's favor." *Salo v. Tyler*, 2018 UT 7, ¶ 30, 417 P.3d 581.

¶21 As explained below, we conclude that reasonable factfinders could reach different conclusions regarding questions of fact relevant to Nassi's conversion and trespass to chattels claims. But we also conclude that no reasonable factfinder could find in Nassi's favor on the intentional infliction of emotional distress claim, so we affirm as to that claim. We further conclude that the district court provided no valid legal basis for granting summary judgment on the request for punitive damages.[9]

---

9. Nassi also argues that the court erred in admitting documents that purported to establish that unit 3 was assigned to Hatsis (not Nassi), as well as by then concluding that there was no dispute that unit 3 was assigned to Hatsis's condominium.

We need not address these issues, however, because the question of whether Hatsis was assigned unit 3 ultimately proves immaterial to our determination that he was not entitled to summary judgment on the conversion, trespass to chattels, and punitive damages claims. As explained below, even if it was true that Hatsis was assigned unit 3, a factfinder could still reasonably determine that he was not entitled to dispose of the items in the unit. And these issues also prove immaterial to our determination that Hatsis was entitled to summary judgment on the intentional infliction of emotional distress claim. As explained, regardless of whether he was assigned unit 3, no reasonable factfinder could determine that the high standard for an intentional infliction of emotional distress claim has been met here.

I. Conversion and Trespass to Chattels

¶22    Nassi first argues that the district court erred in granting summary judgment on the conversion and trespass to chattels claims. We agree.

¶23    "Conversion is an act of willful interference with a chattel, done without lawful justification by which the person entitled thereto is deprived of its use and possession." *Kirkham v. Widdison*, 2019 UT App 97, ¶ 24, 447 P.3d 89 (quotation simplified). "A basic requirement of conversion is that there be a wrongful exercise of control over personal property in violation of the rights of its owner." *Steinberg v. Cmty. Housing Services-Capitol Villa, Ltd.*, 2014 UT App 102, ¶ 11, 326 P.3d 673 (quotation simplified). Similarly, trespass to chattels is understood to occur when one "intentionally (a) dispossess[es] another of the chattel, or (b) us[es] or intermeddl[es] with a chattel in the possession of another." Restatement (Second) of Torts § 217 (Am. L. Inst. 1965) (quotation simplified).[10]

---

10. In distinguishing between the torts of conversion and trespass to chattels, some authorities understand conversion as "entail[ing] a more serious deprivation of the owner's rights such that an award of the full value of the property is appropriate." 75 Am. Jur. 2d *Trespass* § 14 (2022). Some courts have similarly held that the difference turns on the degree of interference and the scope of the available damages. *See, e.g.*, *Weatherly v. Hospice of Lake Cumberland, Inc.*, No. 2018-CA-000248-MR, 2019 WL 1422848, at *2 (Ky. Ct. App. Mar. 29, 2019); *Morrow v. First Interstate Bank of Or., NA*, 847 P.2d 411, 413 (Or. Ct. App. 1993); *Jones v. Boswell*, 250 S.W.3d 140, 143 (Tex. App. 2008).

Nassi's property was thrown out and thus lost entirely, however, and the district court also did not base its summary judgment ruling on any question relating to the available damages. For purposes of this appeal, the viability of both claims

(continued…)

¶24 Here, there's no dispute that the property inside unit 3 belonged to Nassi and that Hatsis caused it to be thrown away. As a result, there's also no dispute that Hatsis completely deprived Nassi of his ability to use and possess his own property. These claims thus turn on whether Hatsis had any "lawful justification" for doing so, *Kirkham*, 2019 UT App 97, ¶ 24 (quotation simplified), or, in other words, whether his actions were "wrongful," *Steinberg*, 2014 UT App 102, ¶ 11 (quotation simplified).

¶25 Our prior cases have not given much substantive meaning to the "lawful justification" and "wrongful" standards, at least in a context like the one at issue here. In some cases, for example, the dispute involved parties who had contracted with each other, so the analyses of whether the action was justified or wrongful rightly focused on whether the taking was allowed under the contract. *See, e.g.*, *Bonnie & Hyde, Inc. v. Lynch*, 2013 UT App 153, ¶¶ 30–33, 305 P.3d 196; *Firkins v. Ruegner*, 2009 UT App 167, ¶ 5, 213 P.3d 895. In another, a statute was seemingly applicable to the situation, thus allowing the analysis to focus on whether the action was statutorily permitted. *See, e.g.*, *Lawrence v. Intermountain, Inc.*, 2010 UT App 313, ¶ 16, 243 P.3d 508.

¶26 Nassi and Hatsis had no contract, however, and neither party has pointed to any statute that provides an answer to whether Hatsis's conduct was legally permitted. In arguing that his conduct was justified, Hatsis instead invokes section 260 of the

---

thus turns on whether Hatsis had a right to dispose of the property at all. Because of this, the parties on appeal have addressed these two claims together, and we'll follow suit. *Cf. Wint v. Alabama Eye & Tissue Bank*, 675 So. 2d 383, 384–85 (Ala. 1996) (explaining that because "the difference between trespass to chattels and conversion is immaterial when there is a wrongful taking and carrying away of the property of another," there was "no need to treat the trespass to chattels and conversion claims separately" (quotation simplified)).

Restatement (Second) of Torts. There, the Restatement posits that a person

> is privileged to commit an act which would otherwise be a trespass to a chattel or a conversion if the act is, or is reasonably believed to be, necessary to protect the actor's land or chattels or his possession of them, and the harm inflicted is not unreasonable as compared with the harm threatened.

Restatement (Second) of Torts § 260(1) (Am. L. Inst. 1965).

¶27    Utah's appellate courts have not formally adopted this Restatement section, nor have they recognized the existence of its proposed privilege. We note, however, that other courts have relied on this section when considering conversion or trespass to chattels claims in situations analogous to this one—i.e., claims that turned on what a landowner could lawfully do with items that were owned by others and that had been left on the landowner's property. *See, e.g., Sullivan v. Delisa*, 923 A.2d 760, 770–71 (Conn. App. Ct. 2007) (applying this provision to a landowner's right to remove a bulldozer that had been left on her property); *Crawley v. Price*, 692 N.W.2d 44, 50 (Iowa Ct. App. 2004) (applying this provision to a homeowner's right to dispose of "valueless property" that had been left behind by a prior occupant); *Kirschbaum v. McLaurin Parking Co.*, 656 S.E.2d 683, 687 (N.C. Ct. App. 2008) (applying this provision to a parking lot owner's ability to boot a car left in the lot); *Sears v. Summit, Inc.*, 616 P.2d 765, 769–70 (Wyo. 1980) (applying this provision to a landowner's claim that he could forcibly detain privately owned vehicles that were on his property).

¶28    In what we understand to be a nod to the general common law, our supreme court has agreed that "Utah follows orthodox criteria in applying the doctrine of conversion." *Benton v. State Lands & Forestry*, 709 P.2d 362, 365 (Utah 1985) (quotation

simplified). While we have no need to formally adopt section 260 of the Restatement, we do agree that the principles expressed in it provide an accurate expression of when a landowner can lawfully exercise control over (or even dispose of) another person's property that has been left behind on the landowner's property.

¶29 But even so, we conclude that the district court erred when it granted Hatsis's request for summary judgment on the conversion and trespass to chattels claims. To begin, we note that this rule largely hinges on what would be "reasonabl[e]" under the circumstances. Restatement (Second) of Torts § 260(1). "Ordinarily, . . . questions of reasonableness necessarily pose questions of fact which should be reserved for jury resolution and, except in the clearest cases, should not be disposed of by summary judgment." *Darrington v. Wade*, 812 P.2d 452, 459 (Utah Ct. App. 1991). Such questions should be taken from a jury only when "reasonable minds cannot differ as to the inferences to be drawn from the undisputed facts." *Penunuri v. Sundance Partners, Ltd.*, 2017 UT 54, ¶ 33, 423 P.3d 1150 (quotation simplified).

¶30 Hatsis's proposed defense turns on (1) whether he "reasonably believed" that it was necessary to throw away the items, and (2) whether "the harm inflicted" by doing so was "unreasonable as compared with the harm threatened" by the items' continued presence in unit 3. Restatement (Second) of Torts § 260(1). But because both questions turn on reasonableness, both are questions of fact that must be left for a jury unless this is one of "the clearest cases." *Darrington*, 812 P.2d at 459.

¶31 This is not one of the clearest cases, particularly when the facts are viewed in the light most favorable to Nassi. Even if it's true that this storage unit was assigned to Hatsis, the base facts that we're confronted with are that, shortly after purchasing his condominium, Hatsis discovered a large amount of clothing inside his assigned storage unit and that he then had the clothing thrown away. Hatsis's initial defense is that he was entitled to throw the clothes away because he believed that they were

abandoned. But on this record, a jury could conclude that this belief was unreasonable. After all, there was a lock on the unit's door, thus suggesting that someone intended to protect the items inside. And when Hatsis had a handyman remove the lock, he didn't discover a few stray items of limited value inside the unit. Rather, he discovered a unit full of expensive clothes, including many Italian suits, cashmere sweaters, and dress shirts. Indeed, Nassi later estimated (and because of this procedural posture, we must assume) that there was "not less than $40,850" worth of clothes inside. From this, a jury could conclude that it would have been unreasonable for Hatsis to assume that someone had abandoned such a costly collection of clothing and that he should have instead surmised that someone, somewhere, still maintained an active interest in it.

¶32    Pushing back, Hatsis insists that, despite the items' value, he was entitled to believe that they were abandoned because unit 3 smelled like mothballs. But there are contrary facts about this issue in the record too. In her deposition, Nassi's wife said that she never noticed a smell when she entered unit 3 to retrieve something for Nassi. And Nassi further suggested that he didn't think that the clothes themselves smelled of moth repellant. Viewing the facts in the light most favorable to Nassi, a jury could therefore disregard this aspect of Hatsis's assertion.

¶33    Moreover, we again note that the principle expressed in the Restatement cited by Hatsis turns, in part, on whether the actor "reasonably believed" that it was "necessary" to perform the act in question in order to protect the actor's property, and it further turns on whether "the harm inflicted" was "unreasonable as compared with the harm threatened." Restatement (Second) of Torts § 260(1). Elaborating further, a comment to this section asserts that

> [s]ince the *dispossession* of another of a chattel is
> ordinarily a more serious invasion of his interest in
> the chattel than a mere *intermeddling* with it, it may

well be that the actor is not privileged to dispossess another of a chattel under circumstances which would make it reasonable for him to intermeddle with the chattel.

*Id.* § 260 cmt. c (emphases added).

¶34 This clarification is significant. Again, Hatsis discovered these items inside a basement storage unit in a condominium complex—a place that, by its nature, has many residents (both past and present) and that also has both building management and a homeowners association to turn to for inquiry and dispute resolution. Because of this, a jury could justifiably conclude that while it may have been reasonable for Hatsis to remove the items from his storage unit (thereby "intermeddling" with them), it was not reasonable for him to have them immediately thrown into a dumpster (thus "dispossessing" the rightful owner of those items) without first taking some intermediate step—such as putting the items in the hall or a common area, posting a sign on the door and leaving it there for some period to see who responded, or making inquiries with building management or the homeowners association to see if someone in the building owned the items and had put them in unit 3 by mistake or in accordance with some unknown agreement.

¶35 When the district court concluded that summary judgment was appropriate because Hatsis's "actions *may* [have been] reasonable under the circumstances" (emphasis added), the district court thus had the standard backwards. Although a jury could think that Hatsis's conduct was reasonable, it was also possible that a jury could think it was not. Again, however, summary judgment is appropriate on a fact question only "in the clearest cases," *Darrington*, 812 P.2d at 459, such as when "reasonable minds cannot differ as to the inferences to be drawn from the undisputed facts," *Penunuri*, 2017 UT 54, ¶ 33 (quotation simplified).

¶36 While we express no opinion about the proper or ultimate outcome of this case, we do conclude that a jury could reasonably believe that Hatsis exercised "wrongful . . . control" over Nassi's property, *Steinberg*, 2014 UT App 102, ¶ 11 (quotation simplified), when he threw away the valuable clothes inside the unit without first taking a less permanent step. We accordingly reverse the district court's decision to grant summary judgment in Hatsis's favor on the conversion and trespass to chattels claims.

## II. Intentional Infliction of Emotional Distress

¶37 Nassi next challenges the district court's decision to grant summary judgment to Hatsis on Nassi's claim for intentional infliction of emotional distress. On this, we agree with the district court.

¶38 The tort of intentional infliction of emotional distress requires proof

> that the defendant intentionally engaged in some conduct toward the plaintiff, (a) with the purpose of inflicting emotional distress, or, (b) where any reasonable person would have known that such would result; *and* his actions are of such a nature as to be considered outrageous and intolerable in that they offend against the generally accepted standards of decency and morality.

*Bennett v. Jones, Waldo, Holbrook & McDonough*, 2003 UT 9, ¶ 58, 70 P.3d 17 (emphasis in original, quotation otherwise simplified). This is a two-part test, and the second step, again, requires that the conduct be "outrageous and intolerable." *Id.* (quotation simplified).

¶39 Upon receiving a motion like Hatsis's, "it is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to

permit recovery." *Sorensen v. Barbuto*, 2006 UT App 340, ¶ 21, 143 P.3d 295 (quotation simplified). But our supreme court has "cautioned" that, "due to the highly subjective and volatile nature of emotional distress and the variability of its causations, the courts have historically been wary of dangers in opening the door to recovery" for intentional infliction of emotional distress. *Bennett*, 2003 UT 9, ¶ 59 (quotation simplified).

¶40 When considering this element, we have thus recognized that "an act is not necessarily outrageous merely because it is tortious, injurious, or malicious, or because it would give rise to punitive damages, or because it is illegal." *Nguyen v. IHC Health Services, Inc.*, 2010 UT App 85, ¶ 9, 232 P.3d 529 (quotation simplified). Instead, we have held that the conduct at issue "must be more than unreasonable, unkind, or unfair," and it "must evoke outrage or revulsion." *Id.* (quotation simplified). And we have further held that to prevail on such a claim, the "plaintiff must be able to prove that the defendant engaged in extraordinarily vile conduct, conduct that is atrocious, and utterly intolerable in a civilized community." *Chard v. Chard*, 2019 UT App 209, ¶ 57, 456 P.3d 776 (quotation simplified).

¶41 Line-drawing exercises of this sort are often comparative, and past Utah cases help illustrate the kinds of conduct that can, or cannot, satisfy this element. In *Sorensen*, for example, we held that an intentional infliction of emotional distress claim could survive a dismissal motion where a doctor "communicated ex parte" with an attorney who was representing the other side in a personal injury suit filed by his former patient, "became a paid advocate" for his former patient's "adversary," and then asserted medical diagnoses about his former patient during the litigation that were "[c]ontrary" to his earlier diagnoses. 2006 UT App 340, ¶¶ 2–3, 21–22. And in *Jackson v. Brown*, our supreme court held that an intentional infliction of emotional distress claim could survive a dismissal motion where a man promised to marry a woman, "proposed, scheduled a ceremony, and acquired a [marriage] license," but then "withdrew his promise only hours

before the time scheduled for the ceremony," all without ever revealing to her that he was "already married" "at all times during his relationship" with her and thus legally incapable of marrying her at all. 904 P.2d 685, 686, 688 (Utah 1995).

¶42    By contrast, in *Camco Construction Inc. v. Utah Baseball Academy Inc.*, we held that a plaintiff had no viable claim for intentional infliction of emotional distress where the conduct at issue involved the defendant "parking near someone's house, visiting a facility where that person works three times, and threatening to sue." 2018 UT App 78, ¶ 20, 424 P.3d 1154. We reasoned that while this conduct may have been "unreasonable, unkind, or unfair," it still did "not evoke outrage or revulsion." *Id.* And in *Chard*, we held that a person's "aggressive actions in attempting to apply 'pressure'" on another to "gain control of the family restaurant business" likewise could not meet the standard, reasoning that although the conduct at issue was "aggressive and not particularly reasonable," those were not the "type of extraordinarily vile actions that the law views as utterly intolerable in a civilized community." 2019 UT App 209, ¶ 59 (quotation simplified).

¶43    In this case, we held above that a jury could conclude that Hatsis was liable for conversion and trespass to chattels. And as explained, this was so because a jury could conclude that Hatsis acted unreasonably by throwing out Nassi's property despite having other less destructive options available. But even so, we don't believe that a jury could reasonably conclude that this conduct was so outrageous or intolerable that it could also support a claim for intentional infliction of emotional distress. Even if the known facts are viewed in the light most favorable to Nassi, what happened is that Hatsis threw away items that he found inside a storage unit that he had just been told was assigned to him. Was this conduct destructive? Unquestionably yes. Was it unreasonable and unnecessary under the circumstances? Possibly, which is why a jury should decide the conversion and trespass to chattels claims. But was it so outrageous and

extraordinarily vile that it evokes revulsion? We don't believe that this higher bar could be met. We accordingly affirm the district court's decision to grant summary judgment to Hatsis on this claim.

### III. Punitive Damages

¶44 Finally, Nassi argues that the district court erred in granting summary judgment on his request for punitive damages. On this, we agree with Nassi.

¶45 The district court initially concluded that because the intentional infliction of emotional distress claim was dismissed, there were "no grounds for punitive damages." But although we've held that the court appropriately granted summary judgment on the intentional infliction of emotional distress claim, this does not mean that there was no legal basis for awarding punitive damages. In a number of cases, Utah appellate courts have held that punitive damages can be based on a valid conversion claim. *See, e.g.*, *Mahana v. Onyx Acceptance Corp.*, 2004 UT 59, ¶ 47, 96 P.3d 893; *Lawrence v. Intermountain, Inc.*, 2010 UT App 313, ¶ 21, 243 P.3d 508; *Burton Lumber & Hardware Co. v. Graham*, 2008 UT App 207, ¶ 26, 186 P.3d 1012; *Lake Philgas Service v. Valley Bank & Trust Co.*, 845 P.2d 951, 959–60 (Utah Ct. App. 1993). Above, we reversed the district court's decision to grant summary judgment on the conversion claim. As a result, that claim can provide the basis for an award of punitive damages. To the extent that the district court held that there were no legal grounds for punitive damages, the ruling was erroneous and must be reversed.

¶46 As noted, the court also discussed the punitive damages standard. In light of its initial and seemingly definitive assertion that punitive damages could only be linked to the intentional infliction of emotional distress claim, it's somewhat unclear whether the court meant for this to be an elaboration of why it thought there was no triable claim for intentional infliction of

emotional distress, or whether it instead meant this as an explanation for why punitive damages could not also be based on a conversion claim. In any event, even if we view the court's discussion as an explanation for why punitive damages could not attach to the conversion claim, we conclude that the court erred there too.

¶47  By statute, punitive damages are available when compensatory or general damages are awarded and "it is established by clear and convincing evidence that the acts or omissions of the tortfeasor are the result of willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others." Utah Code § 78B-8-201(1)(a). After accurately reciting this standard, the district court then went further, reciting a passage from *Nguyen* in which we opined that the "defendant must either know or should know" that his conduct "would, in a high degree of probability, result in substantial harm to another, and the conduct must be highly unreasonable conduct, or an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." 2010 UT App 85, ¶ 12 (quotation simplified). We note here that *Nguyen* drew this additional language from *Behrens v. Raleigh Hills Hospital, Inc.*, 675 P.2d 1179, 1187 (Utah 1983), and that *Behrens* drew that language from *Danculovich v. Brown*, 593 P.2d 187, 191, 193 (Wyo. 1979), a decision from the Wyoming Supreme Court that interpreted Wyoming's own punitive damages standard.

¶48  Before 1989, "punitive damages law in Utah was entirely a matter of common law." *C.T. ex rel. Taylor v. Johnson*, 1999 UT 35, ¶ 32, 977 P.2d 479 (Zimmerman, J., dissenting). Indeed, around that same time, our supreme court acknowledged that the cases setting forth the "legal standard for awarding punitive damages in tort cases appear[ed] to be somewhat in conflict." *Miskin v. Carter*, 761 P.2d 1378, 1379 (Utah 1988). In 1989, however, our legislature enacted Utah Code § 78-18-1 (which has since been renumbered as Utah Code § 78B-8-201) "to address for the first

time in statutory form Utah's law regarding punitive damages." *C.T. ex rel. Taylor*, 1999 UT 35, ¶ 32 (Zimmerman, J., dissenting). We see no basis in the current Utah statute for the additional requirements set forth in *Behrens* and *Nguyen* and which were apparently imposed by the district court here. Again, under our current statute, a plaintiff must establish "by clear and convincing evidence that the acts or omissions of the tortfeasor are the result of willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others." Utah Code § 78B-8-201(1)(a). To the extent that the district court's ruling required Nassi to satisfy some additional standard that goes beyond this, we conclude that the ruling was improper. We therefore reverse the ruling for this additional reason.

CONCLUSION

¶49     For the reasons stated above, we reverse the district court's decision to grant summary judgment on the conversion and trespass to chattels claims, as well as its decision to dismiss the request for punitive damages, but we affirm its decision to grant summary judgment on the intentional infliction of emotional distress claim. We accordingly remand for further proceedings consistent with this opinion.

———————